**In re Gerald W. LANGLEY, Marcia A. Langley, Debtors.**

**Bankruptcy No. 86–05021.**

United States Bankruptcy Court, E.D. Wisconsin.

May 25, 1988.

---

Robert B. Corris, Michael C. Runde, Milwaukee, Wis., for American Bank of Wisconsin.

Donald E. Whitney, Chicago, Ill., for Gerald & Marcia Langley, debtors.

Todd C. Lyster, Chicago, Ill., for trustee.

David J. Matyas, De Pere, Wis., trustee.

Dennis P. Moroney, Milwaukee, Wis., for Miracle Feeds, Inc.

## DECISION

DALE E. IHLENFELDT, Bankruptcy Judge.

The trustee has asked the court, pursuant to Bankruptcy Rule 9019, to approve the proposed settlement of a civil action now pending in the U.S. District Court for this district, Case No. 86–C–0793, entitled

"Gerald W. Langley, Marcia A. Langley and David J. Matyas, in his capacity as United States Bankruptcy Trustee, Plaintiffs, vs. Suring State Bank n/k/a American Bank of Wisconsin, Thomas Cota, Gerald Lackey, Keith Shallow and Peter Vandeven, Defendants." The proposed settlement is opposed by the debtors, Gerald and Marcia Langley.

Gerald and Marcia, together with their son and daughter-in-law, Dennis and Star Langley, commenced the lawsuit on August 1, 1986. A few months later, on November 21, 1986, Gerald and Marcia filed a petition under chapter 7 of the Bankruptcy Code. On February 27, 1987, U.S. Magistrate Robert L. Bittner, to whom the case had been transferred, ruled that the claims of Dennis and Star Langley could not be joined in the same action with those of the debtors, and thereafter, on March 16, 1987, an amended complaint was filed naming only Gerald and Marcia as plaintiffs.[1] The trustee was added as a party plaintiff on or about August 25, 1987.

The amended complaint alleges violations of 18 U.S.C. §§ 1962(a), (c) and (d) of the Racketeer Influenced and Corrupt Organizations Act (RICO), and asserts claims under § 1964(c) of the Act, and pendent state claims of common law fraud, conspiracy and breach of fiduciary duty. It alleges that the defendants, Suring State Bank (the bank) and its officers, Thomas Cota, Gerald Lackey, Keith Shallow and Peter Vandeven induced the debtors to move to Wisconsin and to assume certain loans on cattle and equipment, through false and misleading representations about the condition of the cattle and the equipment. The bank denies making any misrepresentations.

A hearing on the trustee's motion was held on March 18, 1988. At the time the trustee scheduled the hearing, he was advised by the Langleys' attorney, William R. Slate, that they supported the settlement. The debtors subsequently obtained new counsel, Donald E. Whitney. Whitney,

---

1. Dennis and Star Langley, as sole plaintiffs, commenced a new and separate lawsuit on    March 26, 1987.

who had been associated with Todd Lyster, the attorney who filed the Langleys' RICO action, filed an objection to the trustee's proposed settlement. At the outset of the hearing the court noted it was immaterial whether Slate had misunderstood their position, or if the Langleys had changed their mind, since they had the right to change their position and oppose the settlement if they so wished.

The record, as presented at the hearing and thereafter supplemented, consisted of statements of counsel, briefs, and documentary exhibits such as affidavits and portions of deposition testimony. The trustee, the principal unsecured creditors and the bank urged approval. In opposition were Whitney and Lyster, on behalf of the debtors, contending that the settlement was unreasonably low, and a creditor who was not in position to benefit from the settlement because of failure to file a timely claim.

In brief, the proposed settlement provides:

1. The bank is to pay the bankruptcy estate $56,500.

2. The bank, which had filed an unsecured claim in the amount of $265,027.10, is to withdraw any and all claims against the estate.[2]

3. The case of Gerald and Marcia Langley vs. the Suring Bank et al. is to be dismissed with prejudice.

4. The trustee and Gerald and Marcia Langley are to execute releases of all claims against the bank and its past and present officers, employees, shareholders, etc.[3]

5. The settlement includes all attorneys fees by contract, statute or otherwise; the plaintiffs must waive any right to move the district court for award of

fees under 18 U.S.C. § 1964(c) or any other statute.

As stated in the trustee's notice, it is anticipated that the settlement will result in a dividend of approximately 63% to the unsecured creditors (other than the bank), computed as follows:

| | | |
|---|---|---|
| Gross settlement amount | | 56,500.00 |
| Attorney Todd Lyster—⅓ contingent attorney's fee | 18,333.00* | |
| Attorney Todd Lyster—costs of $7,804.11, reduced by $7,500 retainer paid him by the Langleys | 304.11 | |
| David J. Matyas—trustee's fee | 1,875.00 | |
| Attorney William R. Slate—attorney for the debtors in the bankruptcy case | 450.00 | |
| Mailing fees of Bankruptcy Clerk (estimated) | 60.00 | |
| Total Fees and Costs | | 21,022.11 |
| Net Settlement Proceeds | | 35,477.89 |
| Less Exempt portion of proceeds to Langleys | | 8,300.00 |
| Net available to creditors 4 | | 27,177.89* |
| Total unsecured claims filed (other than the bank) | | 42,713.59 |

\* The Trustee's notice understates the contingent fee and overstates the net available to creditors by $500.

The figures indicate an estimated dividend of 63.62% to the unsecured creditors.

In his February 27, 1987 decision (p. 10), the Magistrate summarized the debtors' allegations as follows:

On the basis of the facts well pleaded in the plaintiffs' complaint, the Court gleans the following scenario: The defendants devised a false and fraudulent scheme, whereby they would improve the bank's loan portfolio and its overall financial condition by obtaining new borrowers and buyers from outside the State of Wisconsin to purchase or lease various property in which the bank held an interest. Specifically, the bank had an interest in three (3) dairy farms; all located in the bank's trading area in northeastern Wisconsin, to-wit: the Schlegel farm, the Rohr farm, and the Weber farm. Additionally, the bank had an interest in the cows and equipment located on the Schlegel farm and the

---

2. Because of liquidation of collateral, the bank noted that its unsecured claim now approximates $193,000.

3. The debtors, Gerald and Marcia Langley, have said they will not sign any releases. The bank has responded that it will waive that part of the proposed settlement requiring Gerald and Marcia Langley to sign releases.

4. The bank is secured by an interest in real estate in Michigan. Withdrawal of all its claims as provided in the settlement would make this available to general creditors, but its value, if any, is unclear.

Rohr farm (the cows and equipment of the Rohr farm being known as the Beaumier cows and equipment.)

In furtherance of a scheme to induce the plaintiffs to separately purchase property, the bank, in conspiracy with others, made false and fraudulent representations as to the different properties regarding the value of the property, the health of the cows, the financial viability of the farms, and the condition of the equipment, improvements, and dairy operations.

In the implementation of the scheme, the defendants caused the plaintiffs, Dennis and Star Langley, to return twenty-five (25) phone calls to defendant Keith Shallow between October 5, 1984 and February 7, 1985 and the plaintiffs, Gerald and Marcia Langley to return twenty-four (24) such phone calls between February 12 and 28, 1985, relating to the separate properties they were negotiating to purchase from the bank. The plaintiffs allege these telephone calls constitute multiple acts of wire fraud in violation of 18 U.S.C. § 1343.

As a result of the defendants' misrepresentations to them, Dennis and Star Langley did purchase the Schlegel farm, cows, and equipment on February 15, 1985 at allegedly inflated prices. As a result of defendants' misrepresentations to them, on March 1, 1985 Gerald and Marcia Langley did purchase the Beaumier cows and equipment at allegedly inflated prices and leased the Rohr land. The defendants were not successful in inducing either of the plaintiffs to purchase the Weber farm.

In furtherance of the defendants' scheme, the defendant bank used the United States mails to arrange for and to service the various loans it made to the plaintiffs and also received through the United States mails monthly milk check assignments of Dennis and Star Langley from Frigo Milk Company from March 1985 to the time of the filing of the complaint totaling more than $42,617.88. Similar monthly milk check assignments were received by the bank of Gerald and Marcia Langley from the Frigo Milk Company and the Morning Glory Company from March 1985 until the filing of the complaint totaling more than $60,000.00. The foregoing are alleged as fraudulent acts, in violation of the statute prohibiting mail fraud, 18 U.S.C. § 1341.

As a result of the defendants' allegedly fraudulent acts, the plaintiffs, Dennis and Star Langley, claim they have been damaged in the sum of $500,000.00 and the plaintiffs, Gerald and Marcia Langley claim damages in the sum of $770,000.00.

In brief, the plaintiffs allege that the bank, through its officers and employees, devised a false and fraudulent scheme in order to improve the bank's loan portfolio and its overall financial condition by obtaining new borrowers and buyers from outside the State of Wisconsin to purchase or lease various property in which the bank held an interest, and that in order to implement the scheme, the bank made false and fraudulent representations concerning the value of the property, the health of the cows, the financial viability of the farms, the condition of the property, and the like. The plaintiffs say these false representations were made in a series of phone calls between October 5, 1984 and February 7, 1985, which phone calls constitute multiple acts of wire fraud in violation of 18 U.S.C. § 1343, and that the United States mail was used in furtherance of the scheme in violation of 18 U.S.C. § 1341. The complaint alleges that these actions of the bank and its officers constitute "a pattern of racketeering activity" in an enterprise engaged in or affecting interstate commerce as provided in 18 U.S.C. §§ 1962(a), (c) and (d).

In *In re Lion Capital Group*, 49 B.R. 163, 175 (Bk.S.D.N.Y.1985), it is stated (citing cases) that in evaluating a proposed settlement, the court should examine:

(a) the probability of success in the litigation;

(b) the difficulties, if any, to be encountered in the matter of collection;

(c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(d) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

In *In re American Reserve Corporation*, 841 F.2d 159, 161 (7th Cir.1987), the court said:

A bankruptcy judge may approve a settlement in a liquidation proceeding if the settlement is in the estate's best interests. (citing cases) Central to the bankruptcy judge's determination is a comparison of the settlement's terms with the litigation's probable costs and probable benefits. Among the factors the bankruptcy judge should consider in his analysis are the litigation's probability of success, the litigation's complexity, and the litigation's attendant expense, inconvenience, and delay (including the possibility that disapproving the settlement will cause wasting of assets).... The bankruptcy judge should also consider the creditors' objections to the settlement; however, the creditors' views are not controlling....

In a settlement context, "fair and equitable" means that the settlement reasonably accords with the competing interests' relative priorities.

■ Having considered the various factors recounted in the above cases, and the briefs, depositions, affidavits and other documents filed herein, together with the statements of counsel, the court believes that the proposed settlement should be approved for the following reasons.

In the first place, the plaintiffs are faced with substantial legal problems. In their written objection the debtors argued that the litigation has a high probability of success in that it has survived a motion to dismiss for failure to state a claim and a motion for summary judgment, and that it has thus surmounted the two most troublesome barriers to the successful litigation of a civil RICO case, that is, the "enterprise" provision and the "pattern of racketeering activity" provision.

This is a misstatement of the Magistrate's ruling. In fact, he said (p. 17) that he would "not address the merits of the defendants' challenge to the allegations of an enterprise under 18 U.S.C. § 1962(c)," and he declined to address the defendants' motion for summary judgment in light of his ruling that the plaintiffs were impermissibly joined in the case. He did say that the complaint contained allegations of a "pattern of racketeering activity" sufficient to withstand a motion to dismiss in that it described two separate episodes, one relating to Dennis and Star Langley's purchase of the Schlegel farm in February, 1985, and the other related to Gerald and Marcia Langley's purchase of the Beaumier herd and equipment and their lease of the Rohr farm in March, 1985.

Section 1964 of Title 18 U.S.C. permits a private plaintiff to bring a civil action for damages based on a violation of § 1962. Essential to such a RICO claim is the (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

In this case, the complaint as amended asserts claims under §§ 1962(a), (c) and (d). "To allege a violation of section 1962(c), the plaintiff must allege that the defendant (1) was employed by or associated with (2) an enterprise engaged in, or the activities of which affected, interstate or foreign commerce, and (3) that the person conducted or participated in the conduct of the enterprise's affairs (4) through a pattern of racketeering activity." *Haroco, Inc. v. American Nat'l Bank & Trust Co. of Chicago*, 747 F.2d 384, 387 (7th Cir.1984), aff'd 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Violation of § 1962(a) requires the receipt of income from a pattern of racketeering and the use of that income in the operation of an enterprise, and § 1962(d) prohibits conspiring to violate the other subsections of § 1962.

For a cause of action under § 1962(c), the liable "person" and the "enterprise" which has its affairs conducted through a pattern of racketeering activity must be separate entities. The same corporation may not be

both. "Person" and "enterprise" are defined in 18 U.S.C. § 1961 at (3) and (4) respectively. They must be distinct in order to state a claim under § 1962(c). *Haroco, Inc.*, 747 F.2d at 400. Accordingly, the defendant bank may not be held liable for conducting its own affairs through a pattern of racketeering activity. It cannot constitute both the enterprise and the RICO defendant. The plaintiffs have alleged that the bank's employees misrepresented the condition of cattle and equipment, but it is not clear to this court how the bank and its employees were associated in any manner apart from the bank's ordinary banking activities. See *Atkinson v. Anadarko Bank and Trust Co.*, 808 F.2d 438 (5th Cir.1987), cert. den. — U.S. —, 107 S.Ct. 3276, 97 L.Ed.2d 780.[5]

As was acknowledged by debtors' counsel, the existence of a pattern of racketeering is also a crucial element of a section 1962 claim. In his February 27, 1987 decision, referred to above, the Magistrate thought the allegations in the complaint regarding Dennis and Star Langley and Gerald and Marcia Langley described two separate episodes and were sufficient to withstand a motion to dismiss. By definition, a "pattern" requires at least two acts of racketeering activity, but on the other hand, while two acts are necessary, they may not be sufficient to establish a pattern.

> The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added). *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.

5. This apparent difficulty may be the reason that a § 1962(a) count was added in the amended complaint. The court of appeals for this circuit has held that the same entity can be both

In *Medical Emergency Service Associates v. Foulke*, 844 F.2d 391 (7th Cir.1988), the court affirmed the trial court's dismissal of a RICO case on the pleadings and also affirmed its award of Rule 11 sanctions against the plaintiff. Quoting from *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322 (7th Cir.1986), the court said,

> A pattern of racketeering activity requires at the barest minimum two "acts of racketeering activity." 18 U.S.C. § 1961(5). In general, however, much more than two such acts must be shown in order to demonstrate a pattern.... *The separate racketeering acts must reflect both "continuity" and "relatedness" in order to constitute a pattern.* 803 F.2d at 323 (Emphasis added.)

Since the separate racketeering acts must reflect both "continuity" and "relatedness" in order to constitute a pattern, it is not sufficient to allege, as the plaintiffs have in this case, that there were a number of phone conversations (commonly referred to as "predicate acts") in which false representations were made to the Langleys, and that the mails were used to arrange, service, and receive payments on the loans. Something more is required. *Lipin Enterprises*, 803 F.2d at 323.

In *Medical Emergency Service Associates*, 844 F.2d at 395, the court cited *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986), and said that the inquiry regarding the existence of a "pattern" is "fact-specific and encompasses a variety of factors, including the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries."

The foregoing authority shows that the existence of a pattern of racketeering activity as required by RICO will depend upon the facts and circumstances of each particular case and that such pattern is produced by their "continuity" plus "rela-

a RICO defendant and an enterprise under § 1962(a). *Haroco, Inc.*, 747 F.2d at 401; *Morgan v. Bank of Waukegan*, 804 F.2d 970, 977 (7th Cir.1986).

tionship" combined. " 'Relationship' implies that the predicate acts involve the same victim or type of misconduct or were committed closely in time, while the term 'continuity' can be read to comprise predicate acts involving different victims or occurring at different points in time." *Medical Emergency Service Associates*, 844 F.2d at 395.

Courts might well differ on whether "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries," as pleaded in the amended complaint, are sufficient to allege a "pattern of racketeering activity." In view of the continuing development of the law regarding the RICO requirement of a "pattern of racketeering activity," it is fair to speculate on what the Magistrate's ruling might be today if the motion to dismiss were renewed as to the amended complaint.

Apart from the foregoing, consideration ought also to be given to legislation now pending in Congress, which, if enacted, might have great impact on this case. H.R. 2983, 100th Congress, in certain cases, would eliminate treble damages and punitive damages, and would require that a defendant be convicted of "predicate acts" as a prerequisite to civil liability.

The plaintiffs will also face problems with respect to the facts. It is the Langleys' contention that they were induced to come to Wisconsin to improve the bank's loan portfolio, and to solve its problems regarding some "classified" loans by taking over the farms in question, that they were induced to do this by false representations made by the bank's representatives in a series of phone calls, and that they suffered tremendous damages as a result.

Prior to moving to Wisconsin, the Langleys had lived in Michigan for many years. Gerald Langley had been a dairy farmer most of his life, his folks had been farmers before him, and his sons, including Dennis Langley, were also experienced dairy farmers. In February, 1985, Dennis and Star Langley purchased the Schlegel farm in Lena, Wisconsin. Several weeks later, the debtors purchased cattle and equipment owned by Donald and Pamela Beaumier and took over operation of the Beaumier farm in Porterfield, Wisconsin. In each case, the bank held notes of the selling farmers, secured by their respective cattle and equipment, and in each case, the purchasers assumed this existing debt. Thus, neither the debtors nor their son and daughter-in-law had to put any money down when they purchased these farms. Thereafter, over a period of time, the bank made additional advances in excess of $80,000 to the debtors.

The Langleys say that false representations were made to them in the course of various phone conversations which they had with the bank's officials, that these acts were related and continuous, and that they constitute a pattern of racketeering activity. Inasmuch as they concede that there were no false representations made in writing, the case depends upon the credence to be given their testimony. Their credibility as witnesses, however, will be impaired in a number of ways.

There is evidence that Dennis Langley came to Wisconsin in response to an ad in a farm magazine, that he signed an offer to purchase the Schlegel farm before he ever met a representative of the bank, that he was an experienced farmer and that he had numerous and ample opportunities to inspect the cattle and equipment in question prior to buying it. Gerald Langley admittedly concealed cattle, sold around 60 cattle out of trust, and put milk checks in the name of his 14 year old seventh grader son. In settling a workmen's compensation claim prior to coming to Wisconsin, he made a statement under oath that he couldn't work anymore as a farmer.

The debtors' position that any and all payments of any kind whatsoever represent damages seems questionable. For example, they list as damages the money loaned to them by the bank, the purchase of equipment with money loaned by the bank, and all of the payments which they made to the bank in payment of the loans.

Who will pay the costs of continuing the litigation if the settlement is rejected? The

debtors did not say. They themselves have no money. They have not yet paid their attorney in the bankruptcy case. The trustee has no money. Knowing that costs will be assessed if the case is tried and lost, and of the Rule 11 sanctions applied in *Medical Emergency Service Associates*, the trustee is likely to move to abandon if the settlement is rejected. The debtors do not appear to have in mind that they might be called upon to pay such costs or that they would in fact pay them. No creditors have offered to fund the lawsuit. The expenses incurred by Attorney Lyster have already exceeded his initial $7,500 retainer. He has not said how many of those expenses remain unpaid.

The bank's unsecured claim of $193,749 plus the $116,255 owed to other unsecured creditors as shown in the schedules or the claims on file total $310,004. Add interest to this total sum from November 21, 1986 until it is paid. Then add the additional costs of litigation, the fees of the trustee and the debtors' bankruptcy attorney, the debtors' $8,300 exemption claims, and finally Lyster's one-third contingency fee. The result: in this case, where neither the debtors nor their son and daughter-in-law paid any money down when purchasing their respective farms, and where the bank thereafter made additional advances in excess of $80,000 to the debtors, a final judgment, entered today, would have to approximate $550,000 before the debtors would be able to get any more than they would in the proposed settlement.[6]

At the hearing on the trustee's motion, Attorney Lyster referred to the settlement offer of $56,500 along with withdrawal of the bank's claim as "a pittance," "ridiculous," "nominal," "cheap," and "piddley." The amounts the settlement would provide to persons other than Lyster and the debtors—$26,677.89 for creditors, $1,875 for trustee's fees, $450 for Slate's fees and $60 for the clerk's costs—total $29,062.89. Thus, the position of these other parties in interest could be bought out for about half of what the bank has offered, and any recovery in the lawsuit in excess of that amount could then be divided by Lyster and the debtors. No such offer has been made.

This decision constitutes the court's findings of fact and conclusions of law, as provided in Rule 52 F.R.Civ.P. and Bankruptcy Rule 7052. An order will be entered in accordance with the decision.

## ORDER APPROVING SETTLEMENT

The trustee has asked the court, pursuant to Bankruptcy Rule 9019, to approve the proposed settlement of civil action No. 86–C–0793, now pending in the U.S. District Court for the Eastern District of Wisconsin, entitled "Gerald W. Langley, Marcia A. Langley and David J. Matyas, in his capacity as United States Bankruptcy Trustee, Plaintiffs, vs. Suring State Bank n/k/a American Bank of Wisconsin, Thomas Cota, Gerald Lackey, Keith Shallow and Peter Vandeven, Defendants."

A hearing on the trustee's motion was held on March 18, 1988. The proposed settlement was supported by the trustee, the principal unsecured creditors, and by the defendant bank. It was opposed by the debtors, Gerald and Marcia Langley. The record, as presented at the hearing and thereafter supplemented, consisted of statements of counsel, briefs, and documentary exhibits such as affidavits and portions of deposition testimony.

The court has this day filed its written decision, constituting the court's findings of fact and conclusions of law, as provided in Rule 52 F.R.Civ.P. and Bankruptcy Rule 7052.

In accordance with the decision of the court,

IT IS ORDERED that the trustee's motion be and the same is hereby granted.

IT IS FURTHER ORDERED that the trustee's proposed settlement of civil action No. 86–C–0793, now pending in the U.S.

6. For each year following today's date until a final judgment is obtained, the court estimates that this threshold sum of $550,000 would need to increase by about $35,000 per year, in order to cover the annual increase in the interest on claims and the corresponding increase in contingent attorney fees. See § 726(a)(5) of the Bankruptcy Code and 28 U.S.C. § 1961(a).

District Court for Eastern District of Wisconsin, entitled "Gerald W. Langley, Marcia A. Langley and David J. Matyas, in his capacity as United States Bankruptcy Trustee, Plaintiffs, vs. Suring State Bank n/k/a American Bank of Wisconsin, Thomas Cota, Gerald Lackey, Keith Shallow and Peter Vandeven, Defendants" be and the same is hereby approved.