Dennis LANGLEY and Star
Langley, Plaintiffs,

v.

AMERICAN BANK OF WISCONSIN (formerly known as the Suring State Bank), Robert C. Safford, Keith Shallow and Peter Vandeven, Defendants.

No. 87–C–371 (JPS).

United States District Court,
E.D. Wisconsin.

March 27, 1990.

Todd C. Lyster, Chicago, Ill., for plaintiffs.

Robert B. Corris, Charne, Glassner, Tehan, Clancy & Taitelman, S.C., Milwaukee, Wis., Joseph C. McCormick, Plier, Judge & McCormick, S.C., Oconto, Wis., for defendants.

## DECISION AND ORDER

STADTMUELLER, District Judge.

This action was filed on March 26, 1987 and assigned to Judge Terence T. Evans. The case was transferred to this court on November 4, 1987. Originally plaintiffs, Dennis and Star Langley, were joined with Gerald and Marcia Langley as plaintiffs in an identical case. The magistrate in the latter case ruled that the two sets of plaintiffs were impermissibly joined, and the instant case was filed as a separate action.

The matter is presently before the court on defendants' motion for summary judgment.

Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) and also bring claims for fraud and breach of fiduciary duty under Wisconsin law against American Bank of Wisconsin (formerly known as the Suring State Bank), its chief executive officer and two others who were bank employees at all relevant times. According to plaintiffs, the bank, through its officers and employees, devised a false and fraudulent scheme to improve the bank's loan portfolio and its overall financial condition by obtaining new borrowers and buyers from outside the state of Wisconsin to purchase or lease various property in which the bank held an interest. They further allege that one or more defendants made false and fraudulent representations as to the different properties regarding property value, cattle health, financial viability of farms, the condition of equipment, improvements, and dairy operations. In implementing their scheme, defendants caused the plaintiffs to return 25 phone calls to defendant Keith Shallow between October 5, 1984 and February 7, 1985. They also caused Gerald and Marcia Langley to return 24 phone calls between February 12, 1985 and February 28, 1985. These phone calls concerned properties the two Langley families were negotiating to purchase from the bank. Plaintiffs allege these phone calls constitute multiple acts of wire fraud in violation of 18 U.S.C. § 1343. They also claim the United States mail was used in furtherance of the scheme in violation of 18 U.S.C. § 1341. According to plaintiffs, defendants' actions constitute "a pattern of racketeering activity" in an enterprise engaged in or affecting interstate commerce as provided in RICO, 18 U.S.C. §§ 1962(a), (c) and (d). Other facts will be discussed below where appropriate.

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgement as a matter of law. *Brown v. Retirement Committee of Briggs & Stratton*, 797 F.2d 521, 525 (7th Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1311, 94 L.Ed.2d 165 (1987); Fed.R.Civ.P. 56(c). All facts must be construed in the light most favorable to the party opposing the motion for summary judgment and all inferences drawn in that party's favor. *Smart v. State Farm Insurance Co.*, 868 F.2d 929, 931 (7th Cir.1989).

As to the respective burdens of the parties on motion for summary judgment, the movant has the burden of showing there is no genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1985). However, "where the nonmoving party will bear the burden of proof on an issue at trial, Rule 56(e) requires that the nonmovant go beyond the pleadings and affirmatively demonstrate, by specific factual showings, that there is a genuine issue of material fact requiring trial." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 938 (7th Cir. 1989). "[A] party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions or prior deposition or otherwise sworn testimony." *Lovejoy Electronics v. O'Berto*, 873 F.2d 1001, 1005 (7th Cir.1989). A party is entitled to summary judgment if his opponent cannot produce material of evidentiary quality demonstrating the existence of a triable issue." *Id.*

Defendants claim summary judgment is appropriate on all counts because the record does not support existence of a pattern of racketeering activity. Plaintiffs allege a number of schemes in their effort to set forth such a pattern. To sufficiently allege a pattern of racketeering activity, plaintiffs must describe two or more predicate acts demonstrating continuity and relatedness. The relationship requirement is rather straightforward: " 'criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' 18 U.S.C. § 3575(e)." *H.J., Inc., et al., v. Northwestern Bell Telephone Co., et al.,* — U.S. ——, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989). As for continuity, plaintiffs merely must

prove "continuity of racketeering activity, or its threat, *simpliciter.*" Id.

■ One scheme alleged is the sale of certain property to Nancy Williams. However, plaintiffs do not dispute defendants' contention that this sale involved a loan made through the First National Bank of Oconto, not the Suring State Bank. Plaintiffs point out that the First National Bank of Oconto merged into the Suring State Bank, which later became defendant American Bank of Wisconsin. Plaintiffs assert that Williams purchased the property based on false representations by Michael Judge, attorney for the Suring State Bank, who was present at Board meetings in which Langley matters were discussed. Plaintiffs further indicate that Robert Safford was the majority stockholder in both the Suring State Bank and the First National Bank of Oconto. But these allegations do not demonstrate a relationship between the Williams transaction and any other incidents alleged as part of the pattern. Furthermore, plaintiffs make no effort to show that American Bank should be treated as a successor to the possible liability of the First National Bank of Oconto.

■ Plaintiffs also allege that Donald and Pamela Beaumier were defrauded by the President of Suring State Bank and Gordon Sorenson when the value of equipment and cattle was misstated to cover the amount of a loan being assumed by the Beaumiers. These circumstances do not support plaintiff's fraud allegations. "Generally, a person who discovers the truth may not claim that a defendant's misrepresentation or omission of information harmed him." *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1253 (7th Cir.1989) (citations omitted). The alleged change in value was made in the presence of the Beaumiers, with their awareness, and not concealed from them.

Plaintiffs next assert that the Suring State Bank perpetrated fraud by inducing David Schlegel to convey his interest in a land contract to the Schlegel farm to the bank in exchange for the bank's promise to lend him money needed to plant his crops. Schlegel conveyed his interest in the land contract but his subsequent request for planting money was rejected.

According to Schlegel's deposition testimony, the bank agreed in February 1984 to lend him money if he signed over to the bank his interest in the land contract on his farm. He initially refused. Within the next two weeks, he signed over his real estate interest to the bank, but did not request a loan at that time. In May 1984 he requested a loan for planting money, but this request was rejected.

Plaintiffs make no effort to show how the Schlegel incident is related to the Langley transactions. That the bank was involved in the Schlegel incident and the Langley transactions does not demonstrate a relationship. On the surface, at least, the types of misrepresentation alleged are not related. Schlegel was induced to believe he might receive a loan; the Langleys were induced to accept mortgages in purchasing property. Beyond the summary given here, plaintiffs make no argument concerning the Beaumier and Schlegel transactions with the bank.

Plaintiffs also fail to indicate how the mail or wire fraud statutes might be relevant to these transactions, or how the bank otherwise might have engaged in racketeering activity with respect to the Schlegels or Beaumiers.

Plaintiffs' presentation, I am compelled to note, has not been helpful in assessing these issues. In their brief opposing defendants' summary judgment motion, plaintiffs rely broadly on material filed in the case, including a list of documents containing not less than 14 complete depositions. Plaintiffs do not cite particular portions of key depositions, but make broad conclusory statements about deposition contents. For example, plaintiffs indicate that the details of the Schlegel fraud are set forth in Dave Schlegel's deposition, which exceeds 200 pages (though the first 65 pages do not appear to have been filed). Plaintiffs rely on reams of depositions, without specific reference to relevant passages. "Absent such specific reference to material facts evidencing triable disputes, [plaintiffs'] insistence that there are such disputes are

merely conclusory denials which are insufficient to refute [defendants'] showing that there are no genuine issues of material fact." *Frito–Lay of Puerto Rico, Inc., v. Canas,* 92 F.R.D. 384, 392 (D.P.R.1981). *Cf. Self v. Great Lakes Dredge & Dock Co.,* 832 F.2d 1540, 1556 (11th Cir.1987) (Affirming the district court's refusal to admit an entire deposition consisting mostly of hearsay where party made no request to admit specific portions: "The district court cannot be expected to wade through a 129–page deposition pulling out the handful of admissible exchanges in the document."), *cert. denied, Great Lakes Dredge & Dock Co. v. Chevron Transport Corp., et al.,* 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604 (1988); *Reynolds,* 882 F.2d at 1254 ("This court is not obliged to comb the record without guidance looking for facts that might call the district court's holding into question, or to conduct the legal research necessary to construct an argument from these facts").

■ The remaining episodes plaintiffs allege as part of the pattern directly involve the Langleys. Plaintiffs identify a number of schemes: the scheme to sell Dennis and Star Langley the Schlegel farm, equipment and cattle and/or to assume the Schlegel obligations; the scheme to defraud plaintiffs attempted when Keith Shallow tried to sell the Weber farm to the Langleys based on false representations; the scheme to make it appear that Dennis Langley had applied for a loan at the Suring State Bank in 1984 when in fact he had not; the scheme to transfer to Gerald and Marcia Langley the Beaumier equipment and cattle; the scheme to sell a certain 1980 Chevrolet truck to Gerald and Marcia Langley; the scheme to sell the Burton Kieffer herd of cows to Gerald and Marcia Langley.

In implementing and furthering these schemes, defendants made false and fraudulent representations concerning livestock, equipment and other aspects of the properties at issue. Defendants also caused plaintiffs as well as Gerald and Marcia Langley to return a number of phone calls concerning the properties they were considering purchasing. Later, the bank used the United States mails to arrange for and to deliver the various loans it made to the plaintiffs, and it received through the mails plaintiffs' monthly milk check assignments.

Plaintiffs purchased the Schlegel farm, cows and equipment at allegedly inflated prices as a result of defendants' misrepresentations on February 15, 1985. As a result of defendants' misrepresentations to them, Gerald and Marcia Langley purchased the Beaumier cows and equipment at allegedly inflated prices and leased the Rohr land on March 1, 1985. Defendants failed to induce the Langleys to purchase the Weber farm.

This court now faces the question of whether plaintiffs describe more than one scheme or episode. Because the two Langley families apparently dealt separately with the bank, it appears fair to recognize two different episodes as having occurred.

The Seventh Circuit has consistently taken a fact specific approach to the pattern requirement. Relevant factors in this inquiry "include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986). The court must consider the "facts and circumstances of the particular case, with no one factor being necessarily determinative." *Id.* at 976. "The limits of the relationship and continuity concepts that combine to form a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a 'pattern of racketeering activity' exists." *H.J., Inc.,* 109 S.Ct. at 2902.

■ In this case, Dennis and Star Langley purchased one farm, Gerald and Marcia Langley purchased another. The other schemes alleged by plaintiffs were merely parts of these transactions. Gerald and Marcia obtained the truck, the Kieffer herd (later returned to the bank and resold), and the Beaumier cattle and equipment as part of a complex transaction to acquire the

elements of a farming operation. The Kieffer herd was obtained a number of weeks after the closing in an effort to attain what the Langleys' viewed as appropriate herd size.[1] Similarly, the bank made a loan to Dennis and Star, for which they purportedly did not apply, as part of the Schlegel farm transfer. And, plaintiffs were shown the Weber farm in the process of selecting the property they would ultimately purchase; it was merely one step in the long real estate sale process. The bank's use of the mail and telephone to conduct the negotiations and financial arrangements were merely elements of the transaction. Merely characterizing incidents as separate schemes does not demonstrate a pattern. Where multiple acts of fraud relate to one scheme with one distinct injury, no RICO pattern exists. *Jones v. Lampe*, 845 F.2d 755, 759 (7th Cir.1988) (and sources cited therein).

It is not unreasonable to conclude that plaintiffs have alleged two predicate acts. The two Langley families obtained their farms in separate transactions. When this litigation originated with all four Langleys as plaintiffs in the same case, the magistrate found that "the complaint contained allegations of a 'pattern of racketeering activity' sufficient to withstand a motion to dismiss in that it described two separate episodes." *In re Langley*, 86 B.R. 977, 981 (Bkrtcy.E.D.Wis.1988). For two incidents

> [t]o constitute a pattern, these two predicate acts must reflect continuity and relatedness. The two concepts are somewhat at odds with one another. Relationship implies that the predicate acts were committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct. Continuity, on the other hand, would embrace predicate acts occurring at different points in time or involving different victims. To focus excessively on either continuity or relationship alone effectively negates the remaining prong.

*Morgan*, 804 F.2d at 975. Certainly the acts are related. The victims are members of the same family; the perpetrators, the method of operation, form and nature of the transactions are all essentially identical. Continuity, however, is lacking. Though the transactions stretched out over a period of months, they were essentially simultaneous, with the two real estate closings occurring within approximately two weeks of one another. In the course of dealing with Keith Shallow, Dennis Langley informed Shallow that Gerald was interested in buying a farm and provided Shallow with Gerald's name and phone number. The possibility of Gerald Langley purchasing a farm arose at least as early as January 1985 and possibly as early as September of the previous year. *See Deppe v. Tripp*, 863 F.2d 1356, 1366 (7th Cir.1988) (showing that transactions need only be distinguishable).

■ The continuity requirement is minimal, but it is also more than nominal. Here the transactions are intertwined enough that there is no clear indication of ongoing activity. Of course, the continuity requirement is "satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business." *H.J., Inc.*, 109 S.Ct. at 2902. But the transactions in this case are too closely related to allow a reasonable inference of regular criminal activity. The Supreme Court has concluded "that when Congress said predicates must demonstrate 'continuity' before they may form a RICO pattern, it expressed an intent that RICO reach activities that may amount to or threaten long-term criminal activity." *Id.* at n. 4. The fact that the two transactions are distinct is not necessarily enough to establish continuity. And relatedness alone does not establish a pattern. Based on the facts and circumstances presented to this court, it is unreasonable to conclude that continuity is present. Plaintiffs have failed to establish a pattern; defendants

---

**1.** While the herd was supposedly acquired at auction, the Langleys learned of the herd through Keith Shallow in the process of purchasing and setting up their farm operation. In fact, though they bid on the cattle at auction, the Langleys never paid any money for them or made financing arrangements. The cattle were ultimately transferred to the next highest bidder.

must prevail on their summary judgment motion.

▬ Defendants also claim judgment on all counts because the representations forming the basis for plaintiffs' claims of mail and wire fraud, the alleged racketeering activity, are nonactionable opinions. An essential element of proof in a mail or wire fraud prosecution is proof of a "scheme or artifice to defraud." 18 U.S.C. §§ 1341, 1343. Showing a scheme to defraud requires proof that defendants possessed fraudulent intent. *United States v. Starr*, 816 F.2d 94 (2nd Cir.1987). Under the mail and wire fraud statutes," there is a difference between 'puffing' and representations that are sufficient to support a scheme to defraud." *United States v. Shelton*, 669 F.2d 446, 465 (7th Cir.) *cert. denied, Bledsoe v. United States*, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). Only "knowingly false statements of fact," as opposed to expressions of opinion, can support the existence of a scheme to defraud. *Id.*

▬ In arguing the motion for summary judgment, the parties address a number of specific asserted misrepresentations. First, defendant Shallow and another loan officer, Ken Huberty, represented the Weber farm to be a "good grade A dairy farm." Dennis Langley acknowledged in his deposition that he believes that he recognized this phrase as a statement of opinion, at least when it was used by Paul Prestin, who evidently showed the Weber farm to the Langleys. Defendants have produced evidence that in Wisconsin a farm is regarded as a "grade A dairy farm" if it is shipping grade A milk. Plaintiffs do not refute this evidence, nor is there evidence showing what grade of milk the Weber farm was shipping when in operation. Plaintiffs assert that defendant Shallow and other persons familiar with the farm knew it to have a bad reputation in the community. Plaintiffs offer no evidence showing that defendants knew or believed that the Weber farm was not a "good grade A dairy farm" when they represented it as such. Bare assertions about the farm's general reputation do not suffice in this regard.

Shallow and Huberty represented that the Schlegel line of equipment was in good working order and that the Schlegel herd was a good healthy herd of cows. In his deposition, Dennis Langley acknowledges that the term "good" is a matter of opinion, and that a "good healthy herd of cows" is likewise a matter of opinion. While Langley offers clear testimony that certain items of the equipment were in disrepair, even decay, the record does not clearly set forth the overall quality of the full line of equipment. Plaintiff offers no evidence showing that Shallow or Huberty knew or believed that their statements to be inaccurate when made.

Shallow and Huberty represented the Schlegel farm to be a good grade A dairy farm. According to plaintiff, Huberty and Shallow knew the farm was not a good grade A dairy farm because they were aware of the Schlegel's financial troubles. Plaintiff produces no evidence indicating that the farm's financial instability meant it was not a grade A farm. Langley himself was aware of the financial difficulties the Schlegels were experiencing in their farming operation before he purchased the farm. He testified at deposition that the Schlegel milk was being bought by dairies as grade A milk at the time Paul Prestin, who showed Langley the Schlegel farm, represented it to be a grade A dairy operation.

Shallow and Huberty represented that there was additional land near the Schlegel farm for rent at less than $25.00 per acre. Plaintiff again offers no evidence that suggests that Shallow and Huberty knew or believed this statement to be untrue when it was made. Plaintiff contends that there was simply no such land for rent at that price when he purchased the Schlegel farm and equipment. However, David Schlegel testified in his deposition that this land was available during 1984, during the growing season immediately preceding plaintiffs' purchase of the Schlegel farm.

Shallow and Huberty said there was a high demand for milk and high milk prices

in the Oconto area. Plaintiff has acknowledged that he has no reason to believe that Shallow and Huberty believed these statements to be false when they were made. Plaintiff also acknowledges that he cannot place a dollar value on the terms "high demand for milk" and "high milk prices" as these terms were used by Shallow.

Shallow and Huberty represented that they were experts in farm financing. This argument, essentially contending that Langley was mislead to rely upon the opinions Shallow and Huberty, is misplaced. It is merely a restatement of plaintiffs' argument of defendants' breach of fiduciary duty, to be considered further below.

Shallow told Langley that he thought Langley could "cash flow" the Schlegel farm with a 12,000 lb. herd average. Plaintiff makes general, unsupported assertions that Shallow knew of the poor condition of the Schlegel equipment and cattle, and that he knew the Langleys could never cash flow based on the condition of the farm, cows, equipment and buildings, as well as the low milk prices, low milk demand and general economic conditions. The only clear evidence plaintiff offers that Shallow knew his statement to be false when made is that the farm did not "cash flow" after Langley purchased it. The record simply does not support the conclusion that Shallow was giving anything more than an opinion, or that he knew this opinion to be false when made.

Shallow promised the Suring State Bank would finance the Langleys for three years at 9.5 percent financing. In an affidavit originally prepared before Dennis and Star Langley filed the instant action, Dennis Langley states that Keith Shallow represented the bank would finance the purchase of the Schlegel operation at 9.5 percent interest and "provide the necessary funding for three years at the same interest rate." According to defendants, Shallow agreed the bank would finance the purchase of the farm, cattle and equipment at 9.5 percent interest, and this "main loan" was always at 9.5 percent interest. However, the defendants acknowledge that some short term loans were written at a rate higher than 9.5 percent, asserting that many of these loans rolled over into the main loan at the 9.5 percent rate to help the Langleys cash flow. These two positions are not necessarily incompatible. Plaintiffs' broad terms are not a clear statement that the bank agreed to finance *everything* at 9.5 percent. Plaintiff offers no evidence that the bank did not provide the "necessary funding" at the agreed rate. Plaintiff does make the broad assertion that defendants did not finance plaintiff at 9.5 percent for three years, but offers no further evidence as to the actual financing terms or conditions.

As to all the foregoing representations, plaintiff has failed to meet the burden of affirmatively demonstrating by specific factual showings, that there is a genuine issue of material fact requiring trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Oriental Health Spa v. City of Fort Wayne*, 864 F.2d 486, 488 (7th Cir.1988). Plaintiff merely offers unsupported generalities. While there is enough evidence to indicate that some of the representations may have been untrue in fact, there is no evidence supporting allegations of fraud.

Plaintiffs' inability to support their RICO claims says nothing about the merits of their fraud and misrepresentation allegations. These claims may or may not stand up in an appropriate forum.

My conclusion precludes the need to further follow the tortious path into RICO's complex and ambiguous territory by considering defendants' numerous other grounds for summary judgment. Some of these grounds were initially raised when defendants moved to dismiss Counts II through V and objected to proposed counts VI through IX of the complaint. Because the parties have now argued these issues on more than one occasion, I will discuss them here.

In count II of the complaint, plaintiffs allege that the bank and the other defendants comprised an "association in fact" under 18 U.S.C. § 1962(c). The individual defendants were, at all relevant

times, officers, directors or employees of the bank.

Because "section 1962(c) requires separate entities as the liable person and the enterprise which has its affairs conducted through a pattern of racketeering activity," *Haroco v. American National Bank and Trust Co. of Chicago*, 747 F.2d 384, 400 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), count II raises the question of whether an association in fact can solely consist of a corporation and its employees, officers or directors. "In the association in fact situation, each participant in the enterprise may be a 'person' liable under RICO, but the association itself cannot be.... [a]nd it is not obvious that the problem can be resolved by merely alleging that the corporation and its employees constitute an association in fact." *Id.* at 401.

Section 1962(c) "requires only some separate and distinct existence for the person and the enterprise." *Id.* at 402. Therefore, the *Haroco* court concluded that a corporation could not be held liable under this section for conducting its own affairs through a pattern of racketeering activity, but that a subsidiary could be liable for conducting through a pattern of racketeering activity the affairs of its parent corporation.

In *McCullough v. Suter*, 757 F.2d 142 (7th Cir.1985), the court found that a sole proprietorship can be an "enterprise" with which its proprietor can be "associated" within the meaning of section 1962(c), where the sole proprietor has employees or associates making the enterprise distinct from him. "The only important thing is that [the enterprise] be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization) separable from the individual." *Id.* at 144.

While both *Haroco* and *McCullough* underscore the need for a minimal level of distinction between "person" and "enterprise", they do not address the question at hand. *McCullough* does state that "[a] sole proprietorship is a recognized legal entity, and, provided it has any employees,

is in any event a 'group of individuals associated in fact.'" *Id.* at 143. But while formally incorporating provides a distinction between a culpable sole proprietor and the nonliable enterprise, *McCullough* does not state that incorporation distinguishes, as potentially liable "persons" under section 1962(c), a corporation and its controlling individuals.

"Enterprise" includes "'any individual, partnership, corporation, association, or other legal entity, ... any union or group of individuals associated in fact although not a legal entity,' 18 U.S.C. § 1961(4), and any combination of them." *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1285 (7th Cir.1983). Despite the inclusiveness of the latter phrase, an organization associating only with its own members presents a problematic association at best. At the very least, "an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself." *Yellow Bus Lines, Inc. v. Local Union 639*, 839 F.2d 782 (D.C.Cir.1988). In *Yellow Bus Lines*, plaintiff alleged an "association in fact" comprised of defendant local union and its business manager. The court concluded:

> Where, as here, the organization is named as defendant, and the organization associates with its member to form the enterprise "association-in-fact", the requisite distinctness does not obtain.... there is no difference between the union as an entity including Woodward as officer, and the union plus Woodward, since "the whole is no different than the sum of its parts in this context." Furthermore, allowing plaintiffs to generate such "contrived partnerships" consisting of an umbrella organization and its subsidiary parts, would render the non-identity requirement of section 1962(c) meaningless."

*Id.* at 791. After all, a corporation acts as a "person" under RICO only through the acts of its agents. An agent can "associate" with the corporation as a distinct, nonliable enterprise. But corporation and agent cannot be distinct associates compris-

ing an enterprise apart from the corporation, "for you cannot associate with yourself, any more than you can conspire with yourself, just by giving yourself a *nom de guerre.*" *McCullough*, 757 F.2d at 144.

In *Atkinson v. Anadarko Bank and Trust Co.*, 808 F.2d 438 (5th Cir.), *cert. denied*, 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 780 (1987), the court held that a bank, its holding company and its employees did not constitute an association in fact enterprise because plaintiffs failed to establish the existence of an entity separate and apart from the bank. Similarly, in affirming the dismissal of a subsection (c) claim, the court in *Odishelidze v. Aetna Life & Casualty Co.*, 853 F.2d 21, 23 (1st Cir.1988), stated that "the Aetna companies and their officers or employees (the named defendants) cannot be the entity that conducts its own affairs through a pattern of racketeering activity." The Langleys insist that the alleged association in fact has an existence apart from the bank because the alleged acts of racketeering cannot be considered legitimate bank activities. But conducting affairs of an ongoing legitimate business through illegitimate means does not necessarily make the business a culpable actor rather than a passive racketeering tool under subsection (c). *Atkinson* and *Yellow Bus Lines* are persuasive. The record offers no basis for concluding that the bank and its employees were associated in any manner apart from ordinary bank activities. As the bankruptcy judge noted regarding Gerald and Marcia Langley's case, "[t]his apparent difficulty may be the reason that a § 1962(a) count was added in the amended complaint." *In re Langley*, 86 B.R. at 982 n. 5.

■ *Respondeat Superior* does not apply "under subsection (c) when a finding of liability would require the "person" and "enterprise" to be the same entity." *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1306–07 (7th Cir.1987) *cert. denied*, — U.S. ——, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989). Under plaintiffs' theory in the present case, the "persons" conducting the affairs of the "enterprise" are: (1) agents of the corporation and (2) the corporation

acting through its agents. Generally, a corporation will be vicariously responsible for the wrongful acts of its employees when the acts are: "(1) related to and committed within the course of employment; (2) committed in furtherance of the corporation; and (3) authorized or subsequently acquiesced in by the corporation." *Rogers*, 834 F.2d at 1306. It appears impossible for an agent to draw the corporation he represents into an association without acting on its behalf.

"Absent the non-identity requirement, *respondeat superior* could operate to impose § 1962(c) liability on a corporation that is unaware of the racketeering activities of its agents and has not been enriched by those activities." *Yellow Bus Lines*, 839 F.2d at 791. That the bank may have engaged in illegal activity would not warrant a jury finding the existence of an enterprise separate from the bank. A corporation may be a liable person under subsection (c). But where a corporation or other organization's sole associates are "persons" controlling the corporation's actions or otherwise acting as agents, the corporation can only be viewed, under subsection (c), as a non-liable enterprise.

This view reflects doubt that a corporation and its agents actually can be distinct liable persons conducting the affairs of an association in fact. Possibly, association with an independent third person may create a new distinction between corporation and agent. It appears plaintiffs must choose between the corporation and its constituents as persons liable. I go no further than to follow the suggestion of *Haroco* and find that an association in fact may not consist of only a corporation and its employees, officers and directors.

■ Even if it were possible for a defendants to comprise an association in fact, the RICO enterprise must be "an entity separate and apart from the pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981). An association in fact must have " 'an ascertainable structure which exists for the purpose of maintaining operations directed

toward an economic goal that has an existence that can be defined a part from the commission of the predicate acts constituting the 'pattern of racketeering activity'" *United States v. Neapolitan*, 791 F.2d 489, 500 (7th Cir.), (quoting *United States v. Anderson*, 626 F.2d 1358, 1372 (8th Cir. 1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981)), *cert. denied*, 479 U.S. 939, 940, 107 S.Ct. 421, 422, 93 L.Ed.2d 371, 372 (1986). Plaintiffs do not allege such an ascertainable structure.

Further, on the facts as alleged, it is not possible to discern an enterprise apart from the bank. Plaintiffs engaged in a business relationship with a bank, which acted through the named individual defendants. The activities in issue were bank activities, whether or not they had legitimate ends. Accepting all plaintiffs' factual allegations as true, the only enterprise available in this case for purposes of subsection (c) is the bank. Plaintiffs might have alleged that the individual defendants conducted the affairs of the bank in violation of subsection (c). They could have brought a claim against the bank itself, for using the proceeds of a pattern of racketeering activity in conducting its own operations, under § 1962(a).

■ Count III of the complaint, pursuant to § 1962(d), alleges a conspiracy among the defendants and "other persons presently unknown" to violate §§ 1962(a) and (c). In this case, the only viable RICO enterprise would be the bank. Even if plaintiffs had claimed the bank as the RICO enterprise, their subsection (d) claim would fail. Since a RICO enterprise is not legally capable of violating § 1962(c), *Haroco*, 747 F.2d at 402,

> it follows that the enterprise cannot agree with another person to violate Section 1962(c) and cannot act in furtherance of the agreement. In order to allege civil conspiracy, a plaintiff must allege the existence of two separate persons who each have the ability to agree to commit the unlawful act. A complaint which attempts to state a violation of Section 1962(d) by alleging that the person and the enterprise conspired to vio-

late Section 1962(c) does not, therefore, state a claim.

*Azcon Steel Co. v. Metropolitan Metals, Inc.*, CCH RICO Business Disputes Guide, para. 6530, 1986 WL 8440 (N.D.Ill. July 28, 1986).

More important, there appears no reason to modify the general rule that a corporation and its agents are not capable of conspiring with each other. All acts of the individual defendants appear to have been performed on behalf of the bank. Abandoning the intracorporate conspiracy doctrine would allow plaintiffs to circumvent the nonidentity requirement of subsection (c). Although separate identity of person and enterprise is not required by subsection (a), a conspiracy requires two persons. Plaintiffs' vague assertion that "other persons presently unknown" were involved in this plot, in the absence of any supporting evidence, does not save count III.

Viewing the bank as the enterprise, it appears possible to allege that the individual defendants conspired with each other to violate subsection (c). Plaintiffs, having been given ample opportunity to refine their claims, do not make this contention.

■ Count IV, entitled "common law fraud and civil conspiracy," alleges that defendants engaged in civil conspiracy to defraud plaintiffs. Though RICO cases split on the issue of whether a corporation can conspire with its employees, this common law conspiracy count is properly governed by Wisconsin law.

The parties do not cite, and this court has not found, a Wisconsin decision on point. However, comparable conspiracy allegations arose in the context of a discrimination claim under 42 U.S.C. § 1985 in *Elbe v. Wausau Hospital Center*, 606 F.Supp. 1491 (W.D.Wis.1985). In the absence of an explicit Wisconsin court holding on the issue, Judge Crabb reasoned in *Elbe* that the Wisconsin Supreme Court would adopt an approach based "on the well accepted principles that a corporation cannot conspire with itself and the the acts of an agent are the acts of the corporation." *Id.* at 1502 (citations omitted).

Plaintiffs argue that the individual defendants were acting not merely as employees of the bank but also for personal enrichment; that defendants were stockholders in the bank and their activities were attempts to enrich themselves through increasing the value of their shares, potential future profits and salaries. It does appear that under Wisconsin law plaintiffs could allege that defendants were acting to enrich themselves rather than on behalf of the corporation, at least in the context of a scheme wholly unrelated to promoting the welfare of the corporation. *Id.* However, in opposing defendants' summary judgment motion, plaintiffs make clear that the bank as an institution was an integral part, and primary beneficiary, of the conspiracy.

 Count V alleges breach of fiduciary duty. Plaintiffs assert that the individual defendants, by virtue of their positions as employees of the bank, owed a fiduciary duty to plaintiffs, including the duties of loyalty, honesty, and full disclosure of all material facts affecting the business transactions of the plaintiffs.

The Wisconsin Supreme Court has found that brokers and lenders administering discretionary, as opposed to nondiscretionary, accounts have a fiduciary duty to their clients. *See, e.g., Merrill Lynch, Pierce, etc. v. Boeck,* 127 Wis.2d 127, 377 N.W.2d 605 (1985). "A discretionary account is one where the broker makes all the investment decisions [whereas the customer determines investment of a nondiscretionary fund]." *Id.* at 135, 377 N.W.2d 605. "A fiduciary relationship does not arise merely because a broker offers advice and counsel upon which a customer has a right to place trust and confidence." *Id.* at 136, 377 N.W.2d 605. A fiduciary duty in this context must arise out of special circumstances. "[A] broker does not have a fiduciary duty to a customer with a nondiscretionary account absent an express contract placing a greater obligation or other special circumstances." *Id.* at 134, 377 N.W.2d 605.

In *Gries v. First Wisconsin,* 82 Wis.2d 774, 264 N.W.2d 254 (1978), the court rejected a theory imposing upon the lender the function of joining with plaintiffs as entrepreneur and assuming the risks fundamental to a new business. In finding no fiduciary duty, the court suggested a standard for assessing the lender's responsibility:

> In the instant case, there is nothing in the record from which an inference could be drawn that the bank made false or misleading representations, or withheld material information from the borrowers; nor is this a case in which the bank was shown to have access to information unavailable to the borrowers, or to have made affirmative representations that the business enterprise would succeed; nor is it a case in which the borrowers were in any sense incompetent, infirm, or peculiarly dependent upon the bank to make their business decisions.

*Id.* at 779, 264 N.W.2d 254. Certainly the Wisconsin Supreme Court has "recognized that persons offering financial investment services have a fiduciary duty to disclose to their clients all material information concerning the transaction involved." *Id.* at 779, 264 N.W.2d 254. What is clearly implicit in *Gries* (an action for negligence in lending plaintiffs money to establish a business which subsequently failed) is made explicit in *Production Credit Ass'n v. Croft,* 143 Wis.2d 746, 423 N.W.2d 544 (App.1988) (foreclosure on farm operator's real estate mortgages and security agreements): "Manifest in the existence of a fiduciary relationship is that there exists an inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of facts involved, or other conditions giving to one an advantage over the other." *Id.* at 755–56, 423 N.W.2d 544.

Responding to the summary judgment motion, in an apparent effort to escape the *Croft* rule, plaintiffs claim for the first time that defendants took on the role of brokers in their dealings with plaintiffs. Plaintiffs seek to impose on defendants the fiduciary duty of a broker administering a discretionary account, as described in *Merrill, Lynch.* The evidence does not support plaintiffs' conclusory allegations that defendants were brokers of any sort. What ultimately governs the present case is the

lack of circumstances giving rise to a fiduciary duty. Plaintiffs establish none of the factors suggested by *Gries* or *Croft* that might make defendants fiduciaries. As the court concluded in *Croft*, the evidence establishes no more than the lender-borrower relationship "one customarily finds where a [bank] is the lender and a farm operator is the borrower. The attitude of assistance and advice [demonstrated by the bank] is no more than one would expect where the lender has a substantial interest in the borrower's financial welfare." *Croft*, 143 Wis.2d at 756, 423 N.W.2d 544. Taking plaintiffs' factual allegations as true, including contentions of fraud and misrepresentation, the evidence clearly establishes that plaintiffs could and did make their own judgments concerning farming matters and did not suffer the inherent dependance that might give rise to a fiduciary duty on the bank's part.

Counts VI through IX are proposed supplements to the complaint. Count VI, alleging violation of § 1962(b), has already been dismissed for failure to comply with Judge Evans' RICO Standing Order stating: "If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise." Rather than comply with the order, plaintiffs' have, over the course of this litigation, inundated this court with paperwork while standing on the vaguest of assertions.

Count VII alleges a RICO § 1962(d) conspiracy to violate § 1962(b). Dismissal of count VI does not affect this count's viability, as a conspiracy is distinct from the underlying crime. Further, subsection (b) does not require existence of an enterprise separate and distinct from the person sought to be held liable. *Liquid Air Corp. v. Rogers*, 834 F.2d at 1307 (7th Cir.1987). However, *Rogers* does not alter the rule that a corporation cannot conspire with its employees. Notwithstanding their ample opportunity to do so, plaintiffs have offered no suggestion as to whether or how the conspiracy might have occurred without the bank's participation. Count VII will be dismissed.

Count VIII claims punitive damages. "[P]unitive damages are in the nature of a remedy and should not be confused with the concept of a cause of action." *Brown v. Maxey*, 124 Wis.2d 426, 431, 369 N.W.2d 677 (1985). More important, plaintiffs' original complaint already contains a prayer for punitive damages and there is no need to assert it as a separate claim in a new count. Count VIII will be dismissed.

Count IX asserts the bank's liability on a *respondeat superior* theory. Because the Seventh Circuit flatly rejects *respondeat superior* doctrine in civil RICO cases, *D & S Auto Parts, Inc. v. Sheldon Schwartz, et al.*, 838 F.2d 964 (7th Cir.), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988), Count IX must be dismissed.

Therefore,

IT IS ORDERED that defendants' motion for summary judgment be and the same is hereby GRANTED, and this action is DISMISSED on its merits.