USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _____ No. 91-2220 RAUL F. RODRIGUEZ, ET AL., Plaintiffs, Appellants, v. BANCO CENTRAL CORPORATION, ET AL., Defendants, Appellees. ___________ ERRATA SHEET The opinion of this Court issued on March 30, 1993 is amended as follows: On page 4, line 1: "finansite" should be "site". March 30, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-2220 RAUL F. RODRIGUEZ, ET AL., Plaintiffs, Appellants, v. BANCO CENTRAL CORPORATION, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jose Antonio Fuste, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Aldrich, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Harry E. Woods with whom Fernando L. Gallardo was on brief for ______________ _____________________ appellant. James G. McLaughlin Torres with whom Luis Sanchez-Betances, _____________________________ ______________________ Ivonne Cruz-Serrano, and Luis A. Melendez-Albizu were on brief for ___________________ ________________________ appellee. ____________________ March 30, 1993 ____________________ BOUDIN, Circuit Judge. In the district court, 152 ______________ buyers of lots of undeveloped real estate in Florida charged the real estate company, the bank that financed the company, and certain individuals with securities fraud under RICO, 18 U.S.C. 1962(c).1 Describing their land sale contracts as "securities," the buyers claimed that their purchases were induced by false representations that the land was suitable for home sites and that the surrounding areas would develop into a thriving community. In fact, the property turned out to be worthless swamp land unfit for development. After a lengthy jury trial, the district court directed a verdict for the defendants, ruling that the land sale contracts were not securities. The buyers appeal. We affirm the district court. I. BACKGROUND The underlying facts, viewing the evidence in the light most favorable to the buyers, can be briefly stated. The buyers, most of whom are residents of Puerto Rico, acquired their lots in Florida beginning in the early 1970's after being approached by the real estate company's sales representatives. During these meetings, the prospective ____________________ 1RICO is the Racketeering Influenced and Corrupt Organizations chapter of the Organized Crime Control Act of 1970, 18 U.S.C. 1961-68. The real estate company was J.C. Investments, Inc. The original financing was by Banco Economias and a group of investors. Banco Central succeeded Banco Economias. -2- -2- buyers were offered the opportunity to purchase subdivided lots in an undeveloped site that would eventually, they were told, include roads, schools, churches, stores and elaborate recreational facilities. The project was touted as an excellent investment due not only to prospective development, but also to its close proximity to Disney World. These oral assurances were bolstered by promotional brochures depicting sporting activities at nearby locations and other literature informing buyers of the development's progress. A cautionary statement, written in small print in one of the promotional brochures, advised that the development was "not a homesite offering." Another pamphlet warned that "[i]mprovements such as roads and drainage are not presently on the property and are not contemplated." Yet another warning, this one prominently featured in a Florida Land Sales Board Offering Statement and included as well in a brochure, advised buyers that the property was not usable for building purposes, that the seller neither promised nor contemplated any improvements, and that 35% of the land was "marshy or swampy" and subject to flooding. Most buyers did not read these warnings and those who did were often told that the warnings were standard boilerplate required for all Florida land sales. Another response was that the swampy sites would be drained and the water diverted to form ponds and lakes. The buyers, -3- -3- according to their testimony, were assured that their land could be used as a home site or for any other purpose. Several chose their lots from a map which divided the development into "residential" and "commercial" sections. The vast majority of buyers, many of whom hoped to retire to Florida, purchased their lots with the intention of building a home. According to their testimony, only a few were concerned solely with the re-sale value of their property and had no intention of residing on or developing the lots themselves. The projected improvements were not made. The buyers eventually learned, some through a local newspaper, that they were the owners of swamp land worth a fraction of the purchase price. At trial, the buyers produced experts who testified that, as a result of zoning restrictions applicable to flood-prone areas, few of the lots could be built on legally. The experts said that, even absent the restrictions, the area was physically unsuitable for any broad-scale development. On August 2, 1982, the buyers brought suit in the district court, making claims against the real estate company, the financing bank, and a number of individuals. The complaint asserted claims under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. 1701 et seq., the ________ Securities Exchange Act, section 10(b), 15 U.S.C. 78j(b), -4- -4- and RICO, 18 U.S.C. 1962(a) (use of racketeering derived income). Much time was consumed with class action disputes, discovery, statute of limitations issues, and various attempts to amend the complaint. Eventually, the district court in November 1989 dismissed all these claims but allowed the buyers to amend in order to allege a RICO claim charging securities fraud as predicate acts.2 Rodriquez v. Banco _________ _____ Central, 727 F. Supp. 759 (D.P.R. 1989), aff'd in part and _______ __________________ vacated in part, 917 F.2d 664 (1st Cir. 1990). _______________ On January 25, 1990, the district court refused to dismiss the new RICO claim based on predicate acts of securities fraud introduced by the new amended complaint. At the same time the court declined to allow the buyers to allege mail fraud under RICO. The distinction, the district court explained, was that securities fraud had been an issue in some form from the outset;3 mail fraud, in the court's view, had not been alleged until after seven years of litigation, including extensive discovery. Trial commenced on August 5, 1991, and concluded on September 24, 1991. The evidence submitted has already been ____________________ 2The Land Sales Act and Securities Exchange Act claims were dismissed on statute of limitations grounds. The RICO claim under 1962(a), charging use of racketeering derived income, was dismissed for lack of standing. 3In addition to the claim of securities fraud under the Securities Act of 1934, the original complaint had also mentioned securities fraud as part of the improvident RICO claim under 18 U.S.C. 1962(a). -5- -5- described briefly and is discussed further below. At the conclusion of the evidence, the court on October 10, 1991, granted a motion for judgment as a matter of law and ordered judgment for all defendants, Rodriguez v. Banco Central, 777 _________ _____________ F. Supp. 1043 (D.P.R. 1991), giving rise to the present appeal. In its lengthy opinion, the district court held inter alia that the land sale contracts were not securities _____ ____ under the federal securities laws. In consequence, the buyers' RICO claim failed for lack of the necessary predicate acts. II. THE RICO CLAIMS RICO makes it unlawful for a person to conduct an enterprise in or affecting interstate commerce through a pattern of "racketeering activity." 18 U.S.C. 1962(c). "Racketeering activity" is defined to include "fraud in the sale of securities." Id. 1961(1)(D). For a "pattern," __ there must be at least two acts of racketeering activity within ten years of each other, id. 1961(5), here, fraud in __ the sale of securities. In this case, the buyers had a sufficient case of fraud to put before a jury. The question is whether it was fraud in the sale of "securities." The district court concluded that no reasonable jury could find the land sale contracts in this case to be "securities," a term that the federal securities laws define -6- -6- to include "investment contracts."4 Rodriquez, 777 F. Supp. _________ at 1060-61. Our analysis on appeal therefore begins by parsing the terms "securities" and "investment contracts," distinguishing them from other forms of property or contractual arrangements. This legal furrow has been well plowed in prior opinions, but imaginative promoters are constantly devising new lures and promises to tempt investors and perplex the courts. The definition of "investment contract" has been bracketed by a set of Supreme Court decisions which, while they involve facts quite different than ours, mark out our path. SEC v. W.J. Howey Co., 328 U.S. 293 (1946) (interest ___ ______________ in citrus enterprise a security); and United Housing _______________ Foundation, Inc. v. Forman, 421 U.S. 837 (1975) (interest in _______________ ______ apartment cooperative not a security). In essence, we have been told by these cases that in defining securities, substance governs form, and the substance of an investment contract is a security-like interest in a "common enterprise" that, through the efforts of the promoter or others, is expected to generate profits for the security holder, either ____________________ 4The courts have construed the term "securities" in light of the definitions of the term provided by the Securities Act of 1933, 15 U.S.C. 77a et seq., and the ______ Securities Exchange Act of 1934, 15 U.S.C. 78a et seq. See ______ ___ Landreth Timber Co. v. Landreth, 471 U.S. 681 (1985). The ___________________ ________ definitions appear respectively in the 1933 Act, section 2(1), 15 U.S.C. 77b(1), and the 1934 Act, section 3(a)(10), 15 U.S.C. 78c(a)(10). -7- -7- for direct distribution or as an increase in the value of the investment. Howey, 328 U.S. at 298-99; Forman, 421 U.S. at _____ ______ 852-53. Each component in the concept matters. There are many investments obtained by contract, such as one's home, that are not an interest in an enterprise. Forman, 421 U.S. at ______ 858. One may have an interest in an enterprise--an employment contract, for example--that is not an entitlement to profits or increased value. Conversely, in a sole proprietorship the owner could have a claim on all profits of the enterprise but there might be no contract or security involved. Further, the Supreme Court cases mark out a concept, not a precise definition. The term "securities," we _______ are told, must be flexibly applied to capture new arrangements comprising the essence of securities, however they may be named. SEC v. C.M. Joiner Leasing Corp., 320 ___ _________________________ U.S. 344, 351 (1943). But not all property is a security, and fuzzy edges do not mean that the concept is unbounded. In this case, apart from the generality of the statutory language, a further, two-fold problem exists in applying the concept to the land sale contracts at issue. First, what the contracts say is not all that the buyers were told by the salespersons; the evidence reveals that many buyers were shown materials and given oral assurances that went beyond or even contradicted the formal legal documents. Second, what -8- -8- the buyers were shown or told, and what their own understandings and intentions were, varied from buyer to buyer. We start with some legal rules of thumb. A simple sale of land, whether for investment or use, is not a "security." E.g., Hocking v. Dubois, 839 F.2d 560, 564 ___ _______ ______ (9th Cir. 1988), modified on reh'g en banc, 885 F.2d 1449 __________________________ (9th Cir. 1989) (en banc), cert. denied, 494 U.S. 1078 _____________ (1990). Even if bought for investment, the land itself does not constitute a business enterprise, and "securities" are interests in an enterprise. Howey, 328 U.S. at 298-99. _____ Thus, one who buys raw land or even a building, hoping to profit from rents or the natural increase in the value of property, is not under normal circumstances treated as purchasing a "security." Aldrich v. McCulloch Properties, _______ _____________________ Inc., 627 F.2d 1036, 1039 n. 1 (10th Cir. 1980). ___ Conventional incidentals, such as the seller's promise to install a road or electricity, is similarly not enough to elevate an ordinary real estate transaction to the status of a security. Id. at 1040. __ At some point, however, the commitments and promises incident to a land transfer, and the network of relationships related to the project, can cross over the line and make the interest acquired one in an ongoing business enterprise. See ___ Howey, 328 U.S. at 299-300. At that point, the interest may _____ be treated as a security, even if not so labeled. Id. at __ -9- -9- 300. And in making this appraisal, the promoter properly is held to his representations as to what he is selling, Joiner, ______ 320 U.S. at 353, even where those promises go well beyond the legal terms of the contracts and the fine print of the disclaimers. In this case the promoters offered the land primarily as an "investment." A number of buyers testified at trial that the salespeople emphasized the investment value of the project, a contention supported by a company sales' manual introduced into evidence, stressing capital appreciation as a prime selling point. Compare Rice v. Branigar Organization, _______ ____ ______________________ Inc., 922 F.2d 788, (11th Cir. 1991) (promotional materials ___ emphasized personal use over investment). A complication is now introduced: while the lots were offered as an investment by the seller, most buyers intended to live on the property and purchased primarily for use. A purchase for use or consumption, it is said, is not a security or investment contract. Forman, 421 U.S. at 852-53. We need not sort out ______ the problem of opposing buyer and seller viewpoints, nor search out buyers who had investment in mind, because another aspect of the matter decides the case. In our view even if every buyer bought for investment, what was purchased in this case was not a share of a business enterprise and so not a security. Taking the evidence most favorably to the buyers, they were sold land in individual -10- -10- parcels with strong and repeated suggestions that the surrounding area would develop into a thriving residential community. But apart from the promise of an existing lodge or a new country club, the evidence did not show that the promoter or any other obligated person or entity was promising the buyers to build or provide anything. A few scraps of evidence, usually ambiguous, may point the other way but we do not think that a reasonable jury could conclude on this record that the defendants were promising to construct a community. A security might exist if the defendants had promised, _____ along with the land sales, to develop the community themselves. Then each buyer might be acquiring an interest not only in land but in a package of commitments that, taken together, could comprise a business venture harnessing the entrepreneurship of the promoter. Each parcel of land would still have a different value, unlike the typical share of stock, but most of the potential gain might depend on the development of the community as a whole. Cf. Joiner, 320 __ ______ U.S. at 348-49 (promised oil well gave mineral leases "most of their value and all of their lure"). The promoter's commitment to build the community, in turn, could constitute the "common enterprise" financed jointly by the buyers. Howey, 328 U.S. at 299. Several decisions have taken this _____ view, and we think they may be correct in principle. E.g., ___ -11- -11- McCown v. Heidler, 527 F.2d 204 (10th Cir. 1975); Miller v. ______ _______ ______ Woodmoor, CCH Fed. Secur. L. Rep. 96,109, 91,998-999 (D.C. ________ Colo. 1976); Aldrich, 627 F.2d at 1038-1040. _______ In this case, however, the most that can be said is that the promoter left the distinct, and distinctly false, impression that a community was going to develop through natural forces. Many buyers were told that Disney World's presence nearby would spur growth. Others were shown pictures of specific sports facilities already existing at specific distances. But aside from the lodge or country club, there was little testimony that specific promises were made by anyone to do specific things.5 Accordingly, what we have is sales of property based on false representations as to its prospects, but there is no pretence of a "common enterprise" managed by the promoter and hence no "security." See, e.g., Woodward v. Terracor, 574 F.2d 1023, 1025 (10th ___ ___ ________ ________ Cir. 1978); Happy Investment Group v. Lakewood Properties, ______________________ _____________________ Inc., 396 F. Supp. 175, 180-81 (N.D. Cal. 1975). ___ One might ask why the absence of a security should matter. The property was made attractive by the promoter's ____________________ 5The promoter proposed to convey an existing house to the community for use as a lodge by buyers visiting their land and offered memberships in a to-be-constructed country club. The latter offer was accepted by none of the 152 buyers who are plaintiffs in this case. In any case, scattered references to these limited amenities would not transform the purchase of a lot into a share in a development venture. See Rice, 922 F.2d at 790-91. ___ ____ -12- -12- claims that a community would arise, and those claims were blatantly false, or so a jury could find. But this is not a simple "fraud" case: the buyers, seemingly through delay, have apparently lost their fraud remedies, except for their RICO claim based on supposed predicate acts of securities fraud. Without securities, this RICO claim evaporates. It is disagreeable for a court to turn away victims who have been wronged. But we cannot disregard controlling Supreme Court decisions or distort the securities laws to rescue plaintiffs who have themselves cast their legitimate remedies away. Puerto Rico law provides ample remedies for defrauded buyers of land. See 31 L.P.R.A. 3408-3409. The Interstate ___ Land Sales Full Disclosure Act, 15 U.S.C. 1701 et seq., ______ offers a broad gauged federal remedy, modeled in part on the Securities Act of 1933. Indeed, RICO itself makes mail fraud a predicate act, 18 U.S.C. 1961(1)(A), but the buyers here delayed too long in asserting this claim. All of these possible claims, federal and local, could have been asserted in a timely filed complaint in this case. Sometimes the law itself is at fault; this time the fault is with the lawyers. III. MISCELLANY Ignoring their own defaults, the buyers' lawyers instead assail the district judge. They devote the first thirty pages of argument in their brief (no reply brief was filed) -13- -13- not to the difficult legal issues of RICO and securities law, but to claims that the district judge barred leading questions, helped certain defendants with their answers, and otherwise misconducted the trial. There is some reason to believe that the district judge, far from tilting against the buyers, took steps to preserve what claims he could for the buyers. One effort he made to expedite the case through certified questions was frustrated in part by the buyers' neglect to follow a simple procedural rule. See Rodriguez v. Banco Central, 917 F.2d at 668-69. He ___ _________ _____________ also permitted the buyers to go to trial on their marginal RICO security claim, allowing them to flesh out their "securities" allegation through evidence of actual representations; many other judges, we are confident, would have dismissed the securities claims before trial in light of the Supreme Court decisions already discussed. In all events, the instances offered to show error and partiality by the district judge in his conduct of the trial are close to trivial. Trial judges are constantly making judgments about the use of leading questions, the need to clarify witness answers, and similar matters of trial management. In this realm the widest possible latitude is given to the judge on the scene. Borges v. Our Lady of the ______ ________________ Sea Corp., 935 F.2d 436, 442 (1st Cir. 1991). We have ________ examined the many examples and transcript citations provided -14- -14- in the buyers' brief. Almost all are routine "calls" by the district judge, who must make hundreds of snap judgments in the course of a long trial, and are well within the bounds of propriety. The only legal point worth mentioning is the buyers' complaint that the trial judge limited or forbade leading questions when the buyers as part of their direct case called certain defendants as witnesses. The buyers urge that the judge erred by refusing to declare the witnesses "hostile" and to allow the use of leading questions on direct. On this point they themselves err. A "hostile" witness, in the jargon of evidence law, is not an adverse party but a witness who shows himself or herself so adverse to answering questions, whatever the source of the antagonism, that leading questions may be used to press the questions home. See United States v. Brown, 603 F.2d 1022, 1025-26 (1st Cir. ___ _____________ _____ 1979). The buyers are on stronger ground in arguing that the rules generally permit leading questions to be used against an opposing party. Fed. R. Evid. 611(c). This is not because that party is a hostile witness in the technical sense but because, however cooperative, the witness has a built-in incentive to slide away from the question or slant the answer. But Rule 611(c) is arguably subject to the overriding command of Rule 611(a) that the court "shall -15- -15- exercise reasonable control over the mode . . . of interrogating witnesses" to elicit truth, avoid delay and protect against harassment. Fed. R. Evid. 611(a). We cannot believe, for example, that a district judge would be compelled to allow leading questions to an adverse party where the judge found that this mode was distorting the testimony of a suggestible adverse-party witness. In all events we need not decide whether the trial judge in this case misread Rule 611(c) or precisely when and how it may be overridden. There can be no reversal on such a ground without a showing of prejudice, Fed. R. Evid. 103(a), and no showing of prejudice without a proffer, ordinarily one in the record. Fed. R. Evid. 103(a)(2). In this case there is no showing of any specific information that might have been elicited, pertinent to the dispositive securities issue, if the buyers' counsel had been permitted to ask the defendants leading questions. Without some notion of where a leading question might have led, any error (if error there was) is harmless. See Ellis v. City of Chicago, 667 F.2d 606, 613 ___ _____ _______________ (7th Cir. 1981). The buyers' final claim is that the trial judge abused his discretion in refusing the buyers' requests to amend their complaint. The amendments would have alleged mail fraud as predicate acts under RICO and stated separate fraud or like claims under Puerto Rican law. Each of these -16- -16- attempted amendments has a somewhat different history. Neither history bears out the charge that the trial judge erred. The original complaint in this case was filed on August 2, 1982. No RICO count asserting mail fraud was included.6 On May 1, 1985, the magistrate ordered that the buyers "will move to amend the complaint"; for almost two years it appears that no amendments were proposed.7 Then amendments were proposed by the buyers on April 10, 1987, and on June 10, 1988, but no mail fraud predicate acts under RICO were asserted in either instance. On December 18, 1989, over seven years after the start of the case and after extensive discovery, the buyers for the first time sought to add mail fraud under RICO to the case. As for fraud claims under Puerto Rican law, no mention was made of such claims in the original complaint. Contrary to the buyers' brief in this court, the first amended complaint, filed in 1987, did not assert such claims; all that appears is a brief reference to unidentified violations ____________________ 6The buyers' brief says that "averments concerning the fraudulent use of the U.S. mails were made" in this complaint. In fact, the complaint refers to the use of the mails in the securities fraud claim, interstate commerce being an element of securities fraud, but no charge of mail fraud appears. 7The buyers' brief asserts, without record citation, that the magistrate asked them to delay moving until after the class certification was settled. The defendants' brief says this is untrue. -17- -17- of "the Civil Code of Puerto Rico and Law 145 of June 18, 1980," in the "jurisdiction and venue" portion of the complaint. The Puerto Rican law claims were first made in the second amended complaint submitted June 10, 1988, purportedly tendered pursuant to a court order permitting a new caption to identify plaintiffs. The district court understandably rejected this attempt to smuggle in new allegations, and the Puerto Rican claims were not raised in the third motion to amend filed December 18, 1989. This corrected version of events speaks for itself. No reason is offered in the buyers' brief why mail fraud and local-law claims, which should have been evident possibilities in 1982, were not asserted straightforwardly and in timely fashion. The further along a case is toward trial, the greater the threat of prejudice and delay when new claims are belatedly added. The district court did not abuse its considerable discretion in denying leave to add new claims years after the case began, after much discovery, and without any adequate excuse for the delay. See generally ___ _________ Tiernan v. Blyth, Eastman, Dillon & Co., 719 F.2d 1, 4-5 (1st _______ ___________________________ Cir. 1983). The judgment of the district court is affirmed. ________ -18- -18-