**TRUSTEES OF BOSTON UNIVERSITY,**
Plaintiff,

v.

**ASM COMMUNICATIONS, INC.** d/b/a A1 Termpaper; Barton Lowe d/b/a Research Assistance; Rebecca Lane d/b/a Term Paper Warehouse and High Performance Papers; the Paper Store Enterprises, Inc. d/b/a the Paper Store, Thousands of Papers and Prestigious Papers; and Harold King d/b/a Paper Shack and Paper Sure, Defendants.

No. CIV.A. 97–12365–PBS.

United States District Court,
D. Massachusetts.

Dec. 4, 1998.

Robert B. Smith, Office of General Counsel, Boston, MA, for Trustees of Boston University.

Abe Korn, Brooklyn, NY, pro se.

Compu–Type, Jersey City, NJ, pro se.

Harvey A. Schwartz, Siobhan M. Sweeney, Schwartz, Shaw & Griffith, Boston, MA, for ASM Communications.

Robert S. Besser, Besser & Chapin, Pacific Palisades, CA, Robert S. Bresser, Pacific Palisades, CA, for Research Assistance, Cynthia Stone, Peter Revson.

Corey C. Shaw, Law Office of Corey C. Shaw, Boston, MA, Kenneth H. Berkland, Jr., Boston, MA, Harvey A. Schwartz, Siob-

han M. Sweeney, Schwartz, Shaw & Griffith, Boston, MA, for paper Store Enterprises, Inc.

Harold King, Shreveport, LA, Harold King, Comstock Park, MI, pro se.

Harold King, Shreveport, LA, Harold King, Comstock Park, MI, for Will Cane.

Christopher T. Lilly, Bernkopf, Goodman & Baseman, Boston, MA, for Mark Tweito, Michael von Plato, Barton Lowe, Andrew Greenstein.

John R. Hitt, Atty. General's Office, Government Bureau, Boston, MA, for Commonwealth of Mass.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This action arises out of the defendants' sale of term papers and other research materials to college students via the Internet, telephone, and electronic and United States mail. Plaintiff Boston University ("BU") claims that the defendants are online "term paper mills" that know or should know that Massachusetts students purchase papers from them for submission as their own work in fulfillment of course and, ultimately, degree requirements. BU's amended complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (Count I), of Mass. Gen. L. ch. 271, § 50, which prohibits the sale of term papers and research materials for submission for academic credit as the original work of another (Count II), and of Mass. Gen. L. ch. 93A, § 11 (Count IV).[1] BU seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

Defendants ASM Communications, Inc. ("ASM"), Research Assistance, The Paper Store Enterprises, Inc. ("Paper Store"), and Harold King move to dismiss all counts pursuant to Fed.R.Civ.P. 12(b)(6). They argue, among other things, that (1) the RICO claim fails because BU has not alleged a separate RICO enterprise; (2) there is no private right of action under Mass. Gen. L. ch. 271, § 50; (3) BU was not engaged in trade or commerce and therefore Mass. Gen. L. ch. 93A, § 11, is inapplicable; and (4) the other state law claims fail as a matter of law. BU alleges federal question and diversity jurisdiction.

On July 1, 1998, a hearing was held on the motions to dismiss the First Amended Complaint. On July 24, 1998, BU filed a motion to amend the complaint a second time. BU's proposed Second Amended Complaint dropped three parties (ASM Communications, Inc., The Paper Store Enterprises, Inc., and Rebecca Lane d/b/a Term Paper Warehouse and High Performance Papers) and added two individual parties (Michael von Plato and Andrew Greenstein). It also added a count asserting a common law claim for aiding and abetting fraud, and it proposed various amendments to cure pleading flaws pointed out by the motions to dismiss. With respect to the dropping and adding of parties, BU claimed that the amendment "simply clarified" the named defendants. Defendants opposed the amendment as untimely and prejudicial. On August 13, 1998, this Court allowed BU to add the common law claim of aiding and abetting fraud but denied the remainder of the motion to amend without prejudice.[2] BU has never renewed the motion to amend.

After hearing, the Court *ALLOWS* defendants' motions to dismiss the First Amended Complaint with respect to Counts I, II, and IV. Pursuant to 28 U.S.C. § 1367(c), the remaining counts are dismissed without prejudice because BU has alleged insufficient

---

1. The complaint also contains counts for tortious interference with university-student relations (Count III), fraud (Count V), and aiding and abetting fraud (Count VI).

2. While amendments should be liberally granted pursuant to Fed.R.Civ.P. 15(a), this Court must permit motions to amend and to add or dismiss parties on such terms as are just, *see* Fed.

R.Civ.P. 21. I denied BU's motion because of the prejudice to the parties resulting from significant belated changes in the amended complaint, the expense and delay of a third round of briefing, and the need for a determination of whether the parties should be dismissed with or without prejudice and with or without costs.

damages to meet the $75,000–per–defendant jurisdictional hurdle.

## BACKGROUND

### A. Standard of Review

For purposes of a motion to dismiss for failure to state a claim, the Court takes as true "the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor." *Coyne v. City of Somerville*, 972 F.2d 440, 442–43 (1st Cir.1992) (citing *Correa–Martinez v. Arrilla-ga–Belendez*, 903 F.2d 49, 51 (1st Cir.1990)). A complaint should not be dismissed under Fed.R.Civ.P. 12(b)(6) unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### B. The Allegations

The alleged facts in the First Amended Complaint are as follows.

Defendants are individuals and corporations engaged in the business of acquiring, preparing, and selling term papers, reports, themes, and theses on a wide range of topics. Targeting high school and college student populations, they advertise their services through campus fliers, college-market magazines, and the Internet, reaching students in Massachusetts, nationwide, and beyond. Purchasers generally can place orders online or over the telephone and can receive the papers by electronic or U.S. mail. The defendants constitute only a handful of the numerous persons and entities currently promoting their businesses and supplying term papers through these media.

Defendants' advertisements capitalize on students' anxieties about term paper topic development, research, writing, and assignment deadlines. In 1997, for example, defendant Paper Store's website contained the following empathetic advice:

> Term papers got ya down? Working on several term papers at once? You've prob-

ably got a case of the . . . TERM PAPER BLUES? ? ?

> If you're like most students, you probably HATE WRITING TERM PAPERS! The hardest part is the research! And then it seems impossible to figure out the thesis statement, layout, format, [sic] for citation, and bibliography style!!

> All you have to do is pick up the phone and call 1–800–90–WRITE[ .] Please have details of your research topic ready when you call.

First Am. Compl. ¶ 37 (quoting Paper Store's website). Many of the ads also boast about the quality and polished appearance of the final work product, explicitly creating the expectation that the papers will earn desirable grades if submitted. Defendant Abe Korn's [3] website claimed the following in 1997:

> Term papers and research papers written from start to finish in all subjects for all high school and college levels. All papers are written by college professors. All term papers and other work are professionally printed on an HP LaserJet 4 Printer with 600 dpi resolution.

> When my customers return for more reports they tell me that they have used my report as reference material and because of this help [they] received an excellent grade. A majority of their reports received grades that ranged from B to A+. IS IT POSSIBLE TO RECEIVE A LOWER GRADE? Yes, if the teacher does not like you or does not believe that you wrote the paper.

*Id.* ¶¶ 37–38 (quoting Abe Korn's website).

With enticements such as these, the defendant businesses and others like them offer students a way to complete their assignments with little, if any, effort required beyond dialing a telephone number or submitting an online order form. Many of the defendants do include disclaimers on their promotional materials warning students that the papers are for research only and are not to be submitted for course credit, *see id.* ¶ 35, and none of the defendants goes so far as to guarantee grades, *see id.* ¶¶ 38–39. Howev-

---

**3.** The action against Abe Korn settled in January 1998.

er, on balance, their advertisements undoubtedly encourage purchasers to turn in the term papers as their own work and at the very least reflect defendants' knowledge that many students will do so.

Concerned about the potential harm to itself and other Massachusetts colleges and universities from defendants' activities, BU organized a sting operation to investigate the nature and extent of online term paper promotion and sales. From June through October of 1997, BU representatives posed as University students and purchased a term paper from each of the defendants by telephone and/or electronic mail. These representatives made it clear to the defendants or their agents that they needed the papers for courses at the University, needed them as quickly as possible, and planned to submit them for academic credit. This information did not deter any of the defendants from agreeing to sell the requested papers. In fact, according to BU, a number of the persons with whom its representatives corresponded openly acknowledged the representatives' purpose and offered advice on how to alter the papers to avoid detection. In addition, many of the papers arrived at BU's door without any disclaimers and complete enough to be submitted virtually unmodified.

Concluding from the prevalence of online "term paper mills," and the ease of obtaining papers, that defendants have sold and continue to sell papers to college students in Massachusetts, BU filed this lawsuit. Among the injuries the University alleges to itself and its 25,000 graduate and undergraduate students from defendants' activities are interference with its educational policies and with students' commitment to academic honesty, increased expenditure of resources to police academic fraud, competitive harm to the students who do abide by the school's honor code, damage to the integrity of BU degrees, and devaluation of its charter. In addition, BU claims that the defendants' conduct violates the educational policies of the Commonwealth of Massachusetts and of other academic institutions in Massachusetts and betrays the public's reliance on the validity of University degrees.[4]

The present action represents only the latest step in a long effort by BU to dismantle term paper mills. In 1981, BU obtained permanent injunctions in Massachusetts Superior Court against various term paper companies. *See Trustees of Boston Univ. v. Minute Research Co.,* No. 10908 (Mass.Sup. Ct. May 14, 1981); *Trustees of Boston Univ. v. Scherer,* No. 27748 (Mass.Sup.Ct. Apr. 14, 1981). In both cases, the court prohibited the defendants from selling term papers with the knowledge or reason to know that there was "a reasonable likelihood" that the papers would be "submitted or used, directly or indirectly, by a student as his own work for credit in satisfaction of a course requirement at a college or university." *Minute Research,* No. 10908; *Scherer,* No. 27748. Research Assistance, Inc., was one of the companies enjoined, and BU claims that some of the other defendants to the present action "are or may be successors [to] or alter egos of" the businesses subject to the prior injunctions.[5] (First Am. Compl. ¶ 46.)

In response to BU's suit, defendants ASM and Paper Store filed counterclaims alleging violations of, *inter alia,* RICO, Mass. Gen. L. ch. 93A, § 11, and common law prohibitions of fraud and abuse of process based on the University's accusations and the misrepresentations it made while conducting its investigation. ASM's sole officer and employee, Michael von Plato, filed a third-party com-

---

4. BU also avers that defendants defraud purchasers of the papers by misrepresenting the nature, source, and quality of the products (including whether a paper was "custom-written" for a student or already available) and the credentials of the paper writers. As BU does not suggest that any of the papers it received during the course of its investigation failed to live up to the defendants' representations, these claims do not constitute the heart of the injury alleged.

5. The federal government has also sought injunctive remedies against these term paper mills. *See United States v. International Term Papers, Inc.,* 477 F.2d 1277 (1st Cir.1973) (holding that 39 U.S.C. §§ 3005 and 3007, relating to mail detention orders in connection with persons engaged in conducting a scheme for obtaining money through mails by means of false representations, were applicable to defendant term paper companies engaged in selling academic papers to students for submission to universities as the work of the students).

plaint against BU, asserting causes of action under 42 U.S.C. § 1983 for infringement of his constitutionally protected speech and under state tort law for intentional infliction of emotional distress. In June of 1998, the Commonwealth of Massachusetts intervened as a defendant pursuant to 28 U.S.C. § 2403(b) in order to address ASM's and other defendants' challenges to the constitutionality of Mass. Gen. L. ch. 271, § 50.

## DISCUSSION

### A.  Motion To Strike

Before addressing defendants' motions to dismiss, the Court must determine whether defendant ASM's motion survives. ASM, citing, *inter alia, Veranda Beach Club Ltd. Partnership v. Western Sur. Co.,* 936 F.2d 1364, 1373–74 (1st Cir.1991), and *Commonwealth v. Doe,* 405 Mass. 676, 678, 544 N.E.2d 860 (1989), has invoked the privilege against self-incrimination of its sole officer and employee, Michael von Plato, in response to BU's discovery requests. BU has moved to strike ASM's motion to dismiss, in part on the ground that ASM's nearly blanket refusal to answer interrogatories and requests for admission or to produce documents on the basis of the privilege severely prejudices its ability to proceed with the action and to reply to ASM's motion.

When a plaintiff validly invokes the privilege against self-incrimination to refuse to answer "relevant and necessary questions" during discovery, "it is within the court's discretion to dismiss the plaintiff's claims," even if he has neither received nor disobeyed an order compelling discovery under Fed. R.Civ.P. 37. *Serafino v. Hasbro, Inc.,* 893 F.Supp. 104, 107 (D.Mass.1995) (citing, *inter alia, Stop & Shop Cos. v. Interstate Cigar Co.,* 110 F.R.D.,105, 108 (D.Mass.1986)), *aff'd,* 82 F.3d 515 (1st Cir.1996). In determining whether to exercise this discretion, the court "must balance the plaintiff's constitutional

privilege ... with the defendant's ability to mount a defense." *Id.* (citing *Wansong v. Wansong,* 395 Mass. 154, 157–58, 478 N.E.2d 1270 (1985)). The privilege "should be upheld unless [the] defendant[ ] ha[s] substantial need for particular information and there is no other less burdensome effective means of obtaining it." *Id.* at 108.

Assuming *arguendo* (albeit dubiously) that ASM's invocation of the privilege is valid, *Serafino* is of no use to BU with regard to ASM's motion to dismiss because ASM is a defendant. In no case has a court balanced a defendant's valid assertion of the privilege with the plaintiff's ability to state a claim for relief. Even if the privilege was improperly asserted, this does not prejudice BU in defending against a motion to dismiss for failure to state a claim. Therefore, the Court *DENIES* BU's motion to strike ASM's motion to dismiss.

As for ASM's counterclaims and Von Plato's third-party complaint, ASM and its officer are in the position of plaintiffs, and the *Serafino* analysis applies. The counterclaims and third-party complaint are dismissed without prejudice. However, for the purpose of ruling on the Rule 12(b)(6) motions before the Court, BU's motion to strike ASM's answer is *DENIED.*

### B.  Mail and Wire Fraud / RICO Claim (Count I)

BU alleges that defendants' activities continually violate 18 U.S.C. § 1341, pertaining to mail fraud, and 18 U.S.C. § 1343, pertaining to wire fraud, and therefore constitute violations of RICO, 18 U.S.C. § 1962. Defendants ASM and Paper Store assert that BU's amended complaint fails to identify a RICO "enterprise" separate and distinct from any of the named defendants, as required to state a violation of 18 U.S.C. § 1962(c).[6]

---

6.  ASM and Paper Store also argue that BU has failed to establish that they have committed the requisite predicate acts of racketeering activity because the defendants have not themselves defrauded the University and because aiding and abetting the commission of mail or wire fraud by students is not an indictable offense under RICO.

The First Circuit has held that predicate acts under RICO can include aiding and abetting mail or wire fraud. *See Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1560 (1st Cir.1994) (citing *United States v. Oreto,* 37 F.3d 739, 751 (1st Cir.1994), and *Pereira v. United States,* 347 U.S. 1, 9, 74 S.Ct. 358, 98 L.Ed. 435 (1954)). *But cf.*

An ambiguity in BU's pleadings creates a threshold issue: on which provision of the RICO statute is BU relying? Count I of the complaint on its face alleges only a violation of 18 U.S.C. § 1962(a). (First Am. Compl. ¶ 62.) However, in each of BU's memoranda in opposition to defendants' motions to dismiss the RICO claim, BU refers to § 1962(c) alone, citing cases interpreting that provision and quoting the test for proving its violation. For example, in its Memorandum in Opposition to ASM's Motion to Dismiss, BU discusses the elements of a § 1962(c) claim. Quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), BU states that a violation of that subsection "requires '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeer[ing] activity.'" (Mem. Opp'n ASM Mot. Dismiss at 16.) In its oppositions to the motions to dismiss of Barton Lowe d/b/a Research Assistance and of Harold King, BU states that the First Amended Complaint "complies with interpretations of § 1962(c)." (Mem. Opp'n Research Assistance Mot. Dismiss at 33; Mem. Opp'n King Mot. Dismiss at 8.) Nowhere does BU mention the elements that must be alleged to make out a claim under § 1962(a).

■ Faced with similar pleading ambiguity in a different case, the Seventh Circuit determined that the plaintiffs had alleged only a § 1962(c) violation. *See Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 402 & n. 21 (7th Cir.1984) (concluding that the plaintiffs had "abandoned" their § 1962(a) claim, even though they had paraphrased that subsection in their complaint, because they had argued only § 1962(c) in court and had not responded to defendants' charge that they had abandoned the § 1962(a) claim), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Here, BU has relied exclusively on § 1962(c) in its memoranda before this Court. It has not refuted ASM's and Paper Store's most recent contention that § 1962(c) is the only, if any, appropriate RICO violation to allege, (ASM & Paper Store Suppl. Mem. Supp. Mot. Dismiss at 5–6).[7] Therefore, I consider BU to have claimed a violation of § 1962(c) alone.

Section 1962(c) prohibits "any person employed by or associated with any enterprise" engaged in or affecting interstate commerce from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).[8]

■ Courts have overwhelmingly interpreted § 1962(c) to require that "the 'person' who engages in the pattern of racketeering activity be an entity distinct from the 'enterprise.'"[9] *Schofield v. First Commodity*

---

*Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 731 (1st Cir.1996) (declining to decide whether aiding and abetting securities fraud can be a RICO predicate act after *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), *superseded in part by statute*, 15 U.S.C. § 78t(f)).

7. Section 1962(a) forbids "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income ... in acquisition of any interest in, or the establishment or operation of, any enterprise" engaged in or affecting interstate commerce. 18 U.S.C. § 1962(a). Under the "investment use rule," a plaintiff does not state a claim under § 1962(a) unless he alleges "a specific injury flowing from the investment and use of racketeering proceeds." *Rhone v. Energy North, Inc.*, 790 F.Supp. 353, 357 (D.Mass.1991). The First Circuit has adopted the "investment use rule." *See Compagnie De Reassurance v. New England Reinsurance Corp.*, 57 F.3d 56, 91–92 (1st Cir.1995) (holding that plaintiffs who had

alleged harm from the predicate acts of mail and wire fraud had failed to prove "that they were harmed additionally by [the defendants'] use or investment of the proceeds of that fraud" as required under § 1962(a)). BU does not claim injury to itself beyond that caused by the defendants' alleged aiding and abetting of students' fraud.

8. "Racketeering activity" is defined as "any act ... indictable under" enumerated sections of Title 18 of the United States Code, including mail and wire fraud. 18 U.S.C. § 1961(1)(B); *see also McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 788 (1st Cir.1990). To establish a "pattern of racketeering activity" as required by § 1962, a plaintiff must allege "at least two" predicate acts of racketeering activity. 18 U.S.C. § 1961(5).

9. For the purpose of § 1962, "person" includes "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). "Enterprise" includes "any individual, partnership, corporation, association,

*Corp.,* 793 F.2d 28, 29 (1st Cir.1986) (citing numerous cases); *see also, e.g., Doyle v. Hasbro, Inc.,* 103 F.3d 186, 191 (1st Cir.1996) ("A RICO person cannot also serve as the RICO enterprise that the person is allegedly conducting in violation of section 1962(c)." (citing *Miranda v. Ponce Fed. Bank,* 948 F.2d 41, 44–45 (1st Cir.1991))); *Arzuaga–Collazo v. Oriental Fed. Sav. Bank,* 913 F.2d 5, 6 (1st Cir.1990) (concluding that "the unlawful enterprise itself cannot also be the person the plaintiff charges with conducting it"). In other words, "the same entity cannot do double duty as both the RICO defendant and the RICO enterprise." *Miranda,* 948 F.2d at 44–45 (citing cases).

■ The rationale behind this rule is that § 1962(c) casts the RICO enterprise as the passive instrument of its agent's racketeering activities, a role inconsistent with liability even for a "wholly illegitimate operation." *Schofield,* 793 F.2d at 31 ("[S]ection 1962(c) requires that the culpable person be 'employed by or associated with' an enterprise; we think it stretches the language too far to suggest that a corporation can be employed by or associated with itself.").

■ BU argues that it has complied with the "separate entities" requirement by naming both individuals and their businesses as defendants. BU states that it has "alleged an enterprise" simply "by naming the defendants." (Mem. Opp'n ASM Mot. Dismiss at 17.) Paragraph 60 of the First Amended Complaint asserts that "each defendant was a principal in a pattern of racketeering activity *and/or* constituted an enterprise as defined in 18 U.S.C. § 1961(4)." (First Am. Compl. ¶ 60 (emphasis added).) The First Amended Complaint alleges that defendant ASM Communications, Inc. d/b/a A1 Termpaper[10] Enterprises, Inc., and The Paper Store Enterprises, Inc. d/b/a The Paper Store are corporations that contract to supply termpapers to students in Massachusetts. *See id.* ¶¶ 5, 8. Similarly, it alleges that Barton Lowe

d/b/a Research Assistance and Harold King d/b/a Paper Shack and Paper Sure are individuals who are engaged in the same activities. *See id.* ¶¶ 6, 9. BU misunderstands this separateness requirement. When a plaintiff has allegedly "suffered harm at the hands of an enterprise that consists only of a single corporation and its employees, subsidiaries or agents, the plaintiff[ ] 'must choose between the corporation and its constituents as persons liable.' " *Rodriguez v. Banco Central,* 777 F.Supp. 1043, 1054 (D.P.R.1991) (quoting *Langley v. American Bank of Wis.,* 738 F.Supp. 1232, 1241 (E.D.Wis.1990)), *aff'd,* 990 F.2d 7 (1st Cir.1993). "If the plaintiff chooses to identify the corporation as the enterprise through which its employees, as persons, conducted the RICO activity, the corporation is insulated from liability." *Id.* In the instant case, BU has failed to allege that a culpable person was employed by or associated with a RICO enterprise. Count I of the First Amended Complaint is dismissed.

## C. Private Right of Action Under Mass. Gen. L. ch. 271, § 50 (Count II)

BU also seeks relief under a state criminal statute prohibiting, in relevant part, the sale of "a theme, term paper, thesis," or other research material "knowing or having reason to know that [it] ... will be submitted or used by some other person for academic credit and represented as the original work of such person at an educational institution in the commonwealth or elsewhere without proper attribution as to source." Mass. Gen. L. ch. 271, § 50. The statute provides for maximum penalties of a $100 fine and six-months imprisonment. *See id.* The Commonwealth of Massachusetts declined to prosecute the defendants under the statute.[11] (Letter from the Commonwealth of Massachusetts, Office of the Attorney General, to BU of 7/13/98.) Defendants ASM, Paper Store, and Research Assistance and interve-

or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(4).

10. ASM points out that Michael von Plato is its sole shareholder, officer, and employer. (ASM's Answers to Pl.'s Interrogs.)

11. It is this fact that makes ASM's assertion of the privilege against self-incrimination even more dubious, but I leave this issue to the state court.

nor-defendant the Commonwealth contend that there is no private right of action under this statute.

██ Federal courts are " 'hesitant to imply private rights of action from state criminal statutes' " when, as here, no state court has interpreted the particular statute in question. *Watson v. City of New York,* 92 F.3d 31, 36 (2d. Cir.1996) (quoting *In re Integrated Resources, Inc.; Kinley Corp. v. Integrated Resources Equity Corp.,* 851 F.Supp. 556, 564 (S.D.N.Y.1994)).

██ When interpreting a state criminal statute that does not explicitly provide a private right of action, as this one does not, Massachusetts courts have not strictly adhered to the Supreme Court's test for implying private causes of action in federal statutes. In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court identified four important factors for determining "whether a private remedy is implicit in a statute not expressly providing one":

> First, is the plaintiff "one of the class for whose especial benefit the statute was enacted"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law ... ?

*Id.* at 78, 95 S.Ct. 2080 (citations omitted) (quoting *Texas & Pac. R.R. Co. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 60 L.Ed. 874 (1916)).

Massachusetts courts have emphasized the second of these factors: "legislative intent [is] the determinative factor" in deciding whether to infer a private cause of action from a Massachusetts statute. *Loffredo v. Center for Addictive Behaviors,* 426 Mass. 541, 543, 689 N.E.2d 799 (1998); *see also Johnson v. United States Steel Corp.,* 348 Mass. 168, 169–70, 202 N.E.2d 816 (1964) " '[P]enal statutes have been construed as creating a new cause of action ... if, and

only if, that appears by express terms or by clear implication to have been the legislative intent.' " (alteration in original) (quoting *Mezullo v. Maletz,* 331 Mass. 233, 238, 118 N.E.2d 356 (1954)). Some authority does exist for focusing on the first factor, the class of people protected. *See, e.g., Berdos v. Tremont & Suffolk Mills,* 209 Mass. 489, 95 N.E. 876 (1911); *Ludlow Educ. Ass'n v. Town of Ludlow,* 31 Mass.App.Ct. 110, 644 N.E.2d 227 (1991). However, the Supreme Judicial Court has still been "reluctant to infer a private cause of action ... in the absence of some indication from the Legislature supporting such an inference." *Loffredo,* 426 Mass. at 543–44, 689 N.E.2d 799 (reading the *Berdos* line of cases narrowly to hold that "a defendant's violation of a statute that leads to a plaintiff's injury may figure as an element in an otherwise available cause of action, rather than ... provid[ing] a plaintiff with a new cause of action").

██ Unfortunately for BU, the Attorney General persuasively argues that the legislative history behind Mass. Gen. L. ch. 271, § 50, indicates that the Legislature contemplated and then rejected a private right of action under the statute. Of the four term paper bills that the Massachusetts House of Representatives initially considered in 1973, only one provided for private enforcement by university trustees in addition to criminal penalties. *See* H.R. 611 (Mass.1973) ("Whoever violates the provisions of this section may be enjoined therefrom by a petition in equity brought by the attorney general or by the trustees of any university ... or other educational institution having lawful authority in this commonwealth to confer degrees ...."). The Massachusetts House Committee on Education reported favorably only on House Bill 1343, *see* H.R. Educ. Comm. Rep. (Mass. Apr. 10, 1973), which did not include a private remedy, *see* H.R. 1343 (Mass.1973). Ultimately, the Legislature enacted and codified at Mass. Gen. L. ch. 271, § 50, a fifth bill, which also provided only criminal remedies. *See* H.R. 6538 (Mass.1973). Although the House's rejection of House Bill 611 does not constitute a dispositive statement of legislative intent, *cf. Irwin v. Town of Ware,* 392 Mass. 745, 772–73, 467 N.E.2d 1292

(1984), it undercuts any argument that the Legislature meant for Mass. Gen. L. ch. 271, § 50, to include a private remedy.

The fact that BU obtained injunctions against some of the defendants in two prior actions is irrelevant. The state court's brief orders in those cases do not reveal the basis on which the injunctions were granted. Significantly, the wording of the orders is virtually identical to that of a preliminary injunction issued in a similar case, *see Trustees of Boston Univ. v. Champion Research Corp.*, Equity No. 96114 (Mass.Sup.Ct. Oct. 26, 1972), before Mass. Gen. L. ch. 271, § 50, was even enacted.

Thus, Count II is dismissed. Because BU has failed to state a claim under the statute, I need not address defendants' argument that § 50 is unconstitutional under the First Amendment.

### D. State Law Claims

■■■■BU asserts that this Court has diversity jurisdiction over the state law claims under 28 U.S.C. § 1332. Although complete diversity of citizenship exists among the parties, the amount-in-controversy requirement must be satisfied. Generally, in the case of a suit by a single plaintiff against multiple defendants " 'asserting claims against each of them which are separate and distinct, the test of jurisdiction is the amount of each claim, and not their aggregate.' " *Jewell v. Grain Dealers Mut. Ins. Co.*, 290 F.2d 11, 13 (5th Cir.1961) (quoting *Cornell v. Mabe*, 206 F.2d 514, 516 (5th Cir.1953)); *see also* 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3704 (3d ed.1998). In other words, the plaintiff must allege that his claims against *each* defendant reach the required jurisdictional amount. *See Chase Manhattan Bank, N.A. v. Aldridge*, 906 F.Supp. 870, 874 (S.D.N.Y.1995). "Claims against two or more defendants can be aggregated for the purpose of attaining the jurisdictional amount . . . [only] if [the defendants] are jointly liable to the plaintiff." *Jewell*, 290 F.2d at 13 (citing *Walter v. Northeastern R. Co.*, 147 U.S. 370, 13 S.Ct. 348, 37 L.Ed. 206 (1893)); *see also, e.g., Aldridge*, 906 F.Supp. at 874.

■■■ BU's amended complaint provides no basis for concluding that the defendants, independent suppliers of term papers, are jointly liable to BU for the injuries alleged. BU claims only that the total amount in controversy exceeds $75,000, (First Am. Compl. ¶ 13), the amount currently required under § 1332(a). The basis for jurisdiction over the state law claims is supplemental jurisdiction under 28 U.S.C. § 1367(a). The only claim that could ratchet the amount in controversy above the $75,000 minimum for each defendant is the alleged violation of Mass. Gen. L. ch. 93A, § 11, to which I turn next. Section 1367(a) gives the Court discretion to dismiss pendent state claims where the supporting federal claims are dismissed. *See, e.g., United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

BU alleges that the defendants have committed unfair or deceptive acts or practices in violation of Mass. Gen. L. ch. 93A, § 11, which regulates commercial relationships between businesses. In pertinent part, § 11 entitles "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property . . . as a result of the use or employment by another person who engages in any trade or commerce of an . . . unfair or deceptive act or practice" to bring an action for damages or equitable relief. Mass. Gen. L. ch. 93A, § 11.

■■■ Section 11 is only applicable if, first, "the interaction [between the parties] is 'commercial' in nature, and second, . . . the parties were both engaged in 'trade or commerce,' and therefore acting in a 'business context.' " *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 22–23, 679 N.E.2d 191 (1997) (citing *Szalla v. Locke*, 421 Mass. 448, 451–52, 657 N.E.2d 1267 (1995)), *cert. denied*, —— U.S. ——, 118 S.Ct. 599, 139 L.Ed.2d 488 (1997).

■■■ A transaction is "commercial" for the purposes of § 11 if it involves the "arm's-length" exchange of services for compensation. *See id.* at 23, 679 N.E.2d 191. The only transactions that BU entered with each of the defendants consisted of its placement

of orders and payment for term papers during the sting operation. These interactions were commercial in nature.

■ A more interesting question is whether BU can be said to have been engaged in "trade or commerce" at the time of the transactions. Most broadly, an entity is engaged in trade or commerce under 93A when it advertises or sells any property or services of a kind "offered generally by a person for sale to the public in a business transaction." *Manning v. Zuckerman*, 388 Mass. 8, 13, 444 N.E.2d 1262 (1983) (construing the definition of "trade" and "commerce" in Mass. Gen. L. ch. 93A, § 1(b)). A nonprofit or charitable corporation, however, is not engaged in trade or commerce "if, in the transaction in question, the nonprofit is merely engaged in the customary business necessary to meet its charitable purpose." *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 952 F.Supp. 884, 890 n. 4 (D.Mass.1997) (summarizing recent Massachusetts case law), *aff'd*, 142 F.3d 26 (1st Cir.1998). Only if the nonprofit "goes beyond its ordinary business" and aims instead to generate a profit does it fall within § 11. *Id.*

■ Applying this rule in the context of nonprofit educational institutions, the Supreme Judicial Court held that a university is not engaged in trade or commerce "when it undertakes activities in furtherance of its core mission." *Linkage*, 425 Mass. at 26, 679 N.E.2d 191. In *Linkage*, the court found that Boston University was involved in trade or commerce for the purposes of § 11 when it operated a corporate education center to generate cash and contracted with the plaintiff for certain services to be performed there. *See id.* at 24-27, 679 N.E.2d 191. Had the University entered a transaction that was "purely incidental to [its] educational mission," the court noted, it would not have been subject to liability under § 11. *Id.* at 25, 679 N.E.2d 191 (citing *All Seasons Servs., Inc. v. Commissioner of Health & Hosps.*, 416 Mass. 269, 271, 620 N.E.2d 778 (1993) (finding that a hospital's contract for food services was incidental to its core mission of providing medical treatment)).

■ Nothing could be more central to a university's educational mission than an investigation into student cheating at the school. BU did not purchase term papers from the defendants in order to further any profit-oriented scheme, but rather to ascertain the extent of a problem that threatened its integrity as an institution of higher learning. BU was not engaged in trade or commerce when its representatives transacted business with the defendants, and therefore the University has failed to state a claim under Mass. Gen. L. ch. 93A, § 11. Count IV is dismissed.

■ Assuming without deciding that the other state law claims are valid, the Court concludes that there is no conceivable theory of damages that could support a verdict of $75,000 per defendant. To date, BU's discovery has produced evidence of only one sale, by defendant Paper Store, to a BU student who actually turned in the term paper for credit as his own work. (Mem. Opp'n Paper Store Mot. Dismiss at 5.) According to BU, Paper Store has sold papers to five other BU students as well. *See id.* Defendant Harold King has provided the names and electronic mail addresses of seven students in Massachusetts to whom he sold papers, including one of BU's representatives during the investigation, (Information Provided in Compliance with Court's Order of 2/18/98 at 3–4), and he apparently admitted approximately a dozen sales to Massachusetts students in a telephone conversation with BU's counsel, (Mem. Opp'n King's Mot. Dismiss at 2). Any attempt to place a monetary figure on the diminution in the value of the BU degree stemming from the cheating via online paper mills would be speculative. There is nothing in the complaint or record to suggest that efforts to police this elusive kind of cheating have been made or could be made apart from this litigation. Therefore, there is no basis to conclude that BU has suffered more than the jurisdictional amount in damages. Accordingly, the remaining state court claims are dismissed without prejudice for lack of subject matter jurisdiction.

### *ORDER*

BU's motion to strike (Docket No. 88) is *DENIED* with respect to ASM's answer and

motion to dismiss and *ALLOWED* with respect to the counterclaims and third-party complaint. The Court *ALLOWS* defendants' motions to dismiss (Docket Nos. 64, 73, 76, 78, 102 & 133) with respect to Counts I, II, and IV. Counts III, V, and VI are dismissed without prejudice. The Paper Store's counterclaims are dismissed without prejudice for lack of subject matter jurisdiction. Although Rebecca Lane d/b/a Term Paper Warehouse and High Performance Papers did not file a motion to dismiss, BU dropped this party in its proposed Second Amended Complaint. Accordingly, the action against this party is dismissed for lack of prosecution pursuant to Fed.R.Civ.P. 41(b).